# UNITED STATES *v.* LOCKE, GOVERNOR OF WASHINGTON, ET AL.

No. 98–1701.   Argued December 7, 1999—Decided March 6, 2000*

---

*Together with No. 98–1706, *International Association of Independent Tanker Owners (Intertanko)* v. *Locke, Governor of Washington, et al.*, also on certiorari to the same court.

90

92

KENNEDY, J., delivered the opinion for a unanimous Court.

*David C. Frederick* argued the cause for the United States in No. 98–1701. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Douglas N. Letter, Michael Jay Singer, H. Thomas Byron III, David R. Andrews, Judith Miller, Nancy E. McFadden, Paul M. Geier, Dale C. Andrews, James S. Carmichael, Malcolm J. Williams, Jr.,* and *Paul M. Wasserman.* *C. Jonathan Benner* argued the

cause for petitioner in No. 98–1706. With him on the briefs were *Timi E. Nickerson* and *Sean T. Connaughton.*

*William Berggren Collins,* Senior Assistant Attorney General of Washington, argued the cause for respondents in both cases. With him on the brief for the state respondents were *Christine O. Gregoire,* Attorney General, and *Jay D. Geck, Thomas C. Morrill,* and *Jerri Lynn Thomas,* Assistant Attorneys General. *Jeffrey L. Needle* filed a brief for respondent Washington Environmental Council et al. With him on the brief was *John M. MacDonald.*†

†Briefs of *amici curiae* urging reversal were filed for the Government of Belgium et al. by *Alex Blanton* and *Laurie C. Sahatjian;* for the American Waterways Operators by *Eldon V. C. Greenberg* and *Barbara L. Holland;* for the Baltic and International Maritime Council et al. by *Dennis L. Bryant, Charles L. Coleman III, Brian D. Starer,* and *Jovi Tenev;* for the International Chamber of Shipping et al. by *William F. Sheehan, John Townsend Rich,* and *Heather H. Anderson;* for the Maritime Law Association of the United States by *Howard M. McCormack, James Patrick Cooney,* and *David J. Bederman;* for the National Association of Waterfront Employers et al. by *F. Edwin Froelich* and *Charles T. Carroll, Jr.;* for the Product Liability Advisory Council, Inc., et al. by *Kenneth S. Geller, Charles Rothfeld,* and *Robin S. Conrad;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *R. Shawn Gunnarson.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *Mary E. Hackenbracht* and *J. Matthew Rodriquez,* Assistant Attorneys General, *Dennis M. Eagan* and *Michael W. Neville,* Deputy Attorneys General, *Maya B. Kara,* Acting Attorney General of the Northern Mariana Islands, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *John J. Farmer, Jr.,* of New Jersey, *Eliot Spitzer* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Sheldon Whitehouse* of Rhode Island, *Charlie Condon* of South Carolina, and *Jan Graham* of Utah; for San Juan County, Washington, et al. by *Randall K. Gaylord* and *Karen*

JUSTICE KENNEDY delivered the opinion of the Court.

The maritime oil transport industry presents ever-present, all too real dangers of oil spills from tanker ships, spills which could be catastrophes for the marine environment. After the supertanker *Torrey Canyon* spilled its cargo of 120,000 tons of crude oil off the coast of Cornwall, England, in 1967, both Congress and the State of Washington enacted more stringent regulations for these tankers and provided for more comprehensive remedies in the event of an oil spill. The ensuing question of federal pre-emption of the State's laws was addressed by the Court in *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151 (1978).

In 1989, the supertanker *Exxon Valdez* ran aground in Prince William Sound, Alaska, and its cargo of more than 53 million gallons of crude oil caused the largest oil spill in United States history. Again, both Congress and the State of Washington responded. Congress enacted new statutory provisions, and Washington adopted regulations governing tanker operations and design. Today we must determine whether these more recent state laws can stand despite the comprehensive federal regulatory scheme governing oil tankers. Relying on the same federal statute that controlled the analysis in *Ray*, we hold that some of the State's regulations are pre-empted; as to the balance of the regulations, we remand the case so their validity may be assessed in light of the considerable federal interest at stake and in conformity with the principles we now discuss.

---

*E. Vedder;* and for the Steamship Association of Southern California by *David E. R. Woolley* and *Thomas A. Russell.*

Briefs of *amici curiae* were filed for the Government of Canada by *Margaret K. Pfeiffer;* for the Pacific Coast Federation of Fishermen's Associations et al. by *Bryan P. Coluccio;* for the Pacific Merchant Shipping Association by *Sam D. Delich* and *James B. Nebel;* for the Prince William Sound Regional Citizens' Advisory Council by *Avrum M. Gross* and *Susan A. Burke;* and for the Puget Sound Steamship Operators Association et al. by *Richard W. Buchanan* and *Robert W. Nolting.*

I

The State of Washington embraces some of the Nation's most significant waters and coastal regions. Its Pacific Ocean seacoast consists, in large part, of wave-exposed rocky headlands separated by stretches of beach. Washington borders as well on the Columbia River estuary, dividing Washington from Oregon. Two other large estuaries, Grays Harbor and Willapa Bay, are also within Washington's waters. Of special significance in these cases is the inland sea of Puget Sound, a 2,500 square mile body of water consisting of inlets, bays, and channels. More than 200 islands are located within the sound, and it sustains fisheries and plant and animal life of immense value to the Nation and to the world.

Passage from the Pacific Ocean to the quieter Puget Sound is through the Strait of Juan de Fuca, a channel 12 miles wide and 65 miles long which divides Washington from the Canadian Province of British Columbia. The international boundary is located midchannel. Access to Vancouver, Canada's largest port, is through the strait. Traffic inbound from the Pacific Ocean, whether destined to ports in the United States or Canada, is routed through Washington's waters; outbound traffic, whether from a port in Washington or Vancouver, is directed through Canadian waters. The pattern had its formal adoption in a 1979 agreement entered into by the United States and Canada. Agreement for a Cooperative Vessel Traffic Management System for the Juan de Fuca Region, 32 U. S. T. 377, T. I. A. S. No. 9706.

In addition to holding some of our vital waters, Washington is the site of major installations for the Nation's oil industry and the destination or shipping point for huge volumes of oil and its end products. Refineries and product terminals are located adjacent to Puget Sound in ports including Cherry Point, Ferndale, Tacoma, and Anacortes. Canadian refineries are found near Vancouver on Burrard Inlet and the lower Fraser River. Crude oil is transported by sea to

Puget Sound. Most is extracted from Alaska's North Slope reserve and is shipped to Washington on United States flag vessels. Foreign-flag vessels arriving from nations such as Venezuela and Indonesia also call at Washington's oil installations.

The bulk of oil transported on water is found in tankers, vessels which consist of a group of tanks contained in a ship-shaped hull, propelled by an isolated machinery plant at the stern. The Court described the increase in size and numbers of these ships close to three decades ago in *Askew* v. *American Waterways Operators, Inc.*, 411 U. S. 325, 335 (1973), noting that the average vessel size increased from 16,000 tons during World War II to 76,000 tons in 1966. (The term "tons" refers to "deadweight tons," a way of measuring the cargo-carrying capacity of the vessels.) Between 1955 and 1968, the world tanker fleet grew from 2,500 vessels to 4,300. *Ibid.* By December 1973, 366 tankers in the world tanker fleet were in excess of 175,000 tons, see 1 M. Tusiani, The Petroleum Shipping Industry 79 (1996), and by 1998 the number of vessels considered "tankers" in the merchant fleets of the world numbered 6,739, see U. S. Dept. of Transp., Maritime Administration, Merchant Fleets of the World 1 (Oct. 1998).

The size of these vessels, the frequency of tanker operations, and the vast amount of oil transported by vessels with but one or two layers of metal between the cargo and the water present serious risks. Washington's waters have been subjected to oil spills and further threatened by near misses. In December 1984, for example, the tanker ARCO Anchorage grounded in Port Angeles Harbor and spilled 239,000 gallons of Alaskan crude oil. The most notorious oil spill in recent times was in Prince William Sound, Alaska, where the grounding of the *Exxon Valdez* released more than 11 million gallons of crude oil and, like the *Torrey Canyon* spill before it, caused public officials intense concern over the threat of a spill.

Washington responded by enacting the state regulations now in issue. The legislature created the Office of Marine Safety, which it directed to establish standards for spill prevention plans to provide "the best achievable protection [BAP] from damages caused by the discharge of oil." Wash. Rev. Code § 88.46.040(3) (1994). The Office of Marine Safety then promulgated the tanker design, equipment, reporting, and operating requirements now subject to attack by petitioners. Wash. Admin. Code (WAC) § 317–21–130 *et seq.* (1999). A summary of the relevant regulations, as described by the Court of Appeals, is set out in the Appendix, *infra.*

If a vessel fails to comply with the Washington rules, possible sanctions include statutory penalties, restrictions of the vessel's operations in state waters, and a denial of entry into state waters. Wash. Rev. Code §§ 88.46.070, 88.46.080, 88.46.090 (1994).

Petitioner International Association of Independent Tanker Owners (Intertanko) is a trade association whose 305 members own or operate more than 2,000 tankers of both United States and foreign registry. The organization represents approximately 80% of the world's independently owned tanker fleet; and an estimated 60% of the oil imported into the United States is carried on Intertanko vessels. The association brought this suit seeking declaratory and injunctive relief against state and local officials responsible for enforcing the BAP regulations. Groups interested in environmental preservation intervened in defense of the laws. Intertanko argued that Washington's BAP standards invaded areas long occupied by the Federal Government and imposed unique requirements in an area where national uniformity was mandated. Intertanko further contended that if local political subdivisions of every maritime nation were to impose differing regulatory regimes on tanker operations, the goal of national governments to develop effective international environmental and safety standards would be defeated.

Although the United States declined to intervene when the case was in the District Court, the governments of 13 ocean-going nations expressed concerns through a diplomatic note directed to the United States. Intertanko lodged a copy of the note with the District Court. The concerned governments represented that "legislation by the State of Washington on tanker personnel, equipment and operations would cause inconsistency between the regulatory regime of the US Government and that of an individual State of the US. Differing regimes in different parts of the US would create uncertainty and confusion. This would also set an unwelcome precedent for other Federally administered countries." Note Verbale from the Royal Danish Embassy to the U. S. Dept. of State 1 (June 14, 1996).

The District Court rejected all of Intertanko's arguments and upheld the state regulations. *International Assn. of Independent Tanker Owners (Intertanko) v. Lowry*, 947 F. Supp. 1484 (WD Wash. 1996). The appeal followed, and at that stage the United States intervened on Intertanko's behalf, contending that the District Court's ruling failed to give sufficient weight to the substantial foreign affairs interests of the Federal Government. The United States Court of Appeals for the Ninth Circuit held that the State could enforce its laws, save the one requiring the vessels to install certain navigation and towing equipment. 148 F. 3d 1053 (1998). The Court of Appeals reasoned that this requirement, found in WAC § 317–21–265, was "virtually identical to" requirements declared pre-empted in *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151 (1978). 148 F. 3d, at 1066. Over Judge Graber's dissent, the Court of Appeals denied petitions for rehearing en banc. 159 F. 3d 1220 (1998). Judge Graber, although unwilling, without further analysis, to conclude that the panel reached the wrong result, argued that the opinion was "incorrect in two exceptionally important respects: (1) The opinion places too much weight on two clauses in Title I of OPA 90 [The Oil Pollution Act of 1990]

that limit OPA 90's preemptive effect. (2) Portions of the opinion that discuss the Coast Guard regulations are inconsistent with Ninth Circuit and Supreme Court precedent." *Id.*, at 1221. We granted certiorari and now reverse. 527 U. S. 1063 (1999).

## II

The State of Washington has enacted legislation in an area where the federal interest has been manifest since the beginning of our Republic and is now well established. The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution. *E. g.*, The Federalist Nos. 44, 12, 64. In 1789, the First Congress enacted a law by which vessels with a federal certificate were entitled to "the benefits granted by any law of the United States." Act of Sept. 1, 1789, ch. 11, § 1, 1 Stat. 55. The importance of maritime trade and the emergence of maritime transport by steamship resulted in further federal licensing requirements enacted to promote trade and to enhance the safety of crew members and passengers. See Act of July 7, 1838, ch. 191, 5 Stat. 304; Act of Mar. 3, 1843, ch. 94, 5 Stat. 626. In 1871, Congress enacted a comprehensive scheme of regulation for steam powered vessels, including provisions for licensing captains, chief mates, engineers, and pilots. Act of Feb. 28, 1871, ch. 100, 16 Stat. 440.

The Court in *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852), stated that there would be instances in which state regulation of maritime commerce is inappropriate even absent the exercise of federal authority, although in the case before it the Court found the challenged state regulations were permitted in light of local needs and conditions. Where Congress had acted, however, the Court had little difficulty in finding state vessel requirements were pre-

empted by federal laws which governed the certification of vessels and standards of operation. *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), invalidated a New York law that attempted to grant a monopoly to operate steamboats on the ground it was inconsistent with the coasting license held by the vessel owner challenging the exclusive franchise. And in *Sinnot* v. *Davenport,* 22 How. 227 (1859), the Court decided that the federal license held by the vessel contained "the only guards and restraints, which Congress has seen fit to annex to the privileges of ships and vessels engaged in the coasting trade." *Id.,* at 241. The Court went on to explain that in such a circumstance, state laws on the subject must yield: "In every such case, the act of Congress or treaty is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." *Id.,* at 243.

Against this background, Congress has enacted a series of statutes pertaining to maritime tanker transports and has ratified international agreements on the subject. We begin by referring to the principal statutes and international instruments discussed by the parties.

### 1. The Tank Vessel Act.

The Tank Vessel Act of 1936, 49 Stat. 1889, enacted specific requirements for operation of covered vessels. The Act provided that "[i]n order to secure effective provisions against the hazards of life and property," additional federal rules could be adopted with respect to the "design and construction, alteration, or repair of such vessels," "the operation of such vessels," and "the requirements of the manning of such vessels and the duties and qualifications of the officers and crews thereof." The purpose of the Act was to establish "a reasonable and uniform set of rules and regulations concerning . . . vessels carrying the type of cargo deemed dangerous." H. R. Rep. No. 2962, 74th Cong., 2d Sess., 2 (1936). The Tank Vessel Act was the primary source for regulating

tank vessels for the next 30 years, until the *Torrey Canyon* grounding led Congress to take new action.

*2. The Ports and Waterways Safety Act of 1972.*

Responding to the *Torrey Canyon* spill, Congress enacted the Ports and Waterways Safety Act of 1972 (PWSA). The Act, as amended by the Port and Tanker Safety Act of 1978, 92 Stat. 1471, contains two somewhat overlapping titles, both of which may, as the *Ray* Court explained, preclude enforcement of state laws, though not by the same pre-emption analysis. Title I concerns vessel traffic "in any port or place under the jurisdiction of the United States." 110 Stat. 3934, 33 U. S. C. § 1223(a)(1) (1994 ed., Supp. III). Under Title I, the Coast Guard may enact measures for controlling vessel traffic or for protecting navigation and the marine environment, but it is not required to do so. *Ibid.*

Title II does require the Coast Guard to issue regulations, regulations addressing the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of vessels . . . that may be necessary for increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." 46 U. S. C. § 3703(a).

The critical provisions of the PWSA described above remain operative, but the Act has been amended, most significantly by the Oil Pollution Act of 1990 (OPA), 104 Stat. 484. OPA, enacted in response to the *Exxon Valdez* spill, requires separate discussion.

*3. The Oil Pollution Act of 1990.*

The OPA contains nine titles, two having the most significance for these cases. Title I is captioned "Oil Pollution Liability, and Compensation" and adds extensive new provisions to the United States Code. See 104 Stat. 2375, 33 U. S. C. § 2701 *et seq.* (1994 ed. and Supp. III). Title I imposes liability (for both removal costs and damages) on parties re-

sponsible for an oil spill. § 2702. Other provisions provide defenses to, and limitations on, this liability. 33 U. S. C. §§ 2703, 2704. Of considerable importance to these cases are OPA's saving clauses, found in Title I of the Act, § 2718, and to be discussed below.

Title IV of OPA is entitled "Prevention and Removal." For the most part, it amends existing statutory provisions or instructs the Secretary of Transportation (whose departments include the Coast Guard) to take action under previous grants of rulemaking authority. For example, Title IV instructs the Coast Guard to require reporting of marine casualties resulting in a "significant harm to the environment." 46 U. S. C. § 6101(a)(5) (1994 ed. and Supp. V). Title IV further requires the Secretary to issue regulations to define those areas, including Puget Sound, on which single hulled tankers shall be escorted by other vessels. 104 Stat. 523. By incremental dates specified in the Act, all covered tanker vessels must have a double hull. 46 U. S. C. § 3703a.

*4. Treaties and International Agreements.*

The scheme of regulation includes a significant and intricate complex of international treaties and maritime agreements bearing upon the licensing and operation of vessels. We are advised by the United States that the international regime depends upon the principle of reciprocity. That is to say, the certification of a vessel by the government of its own flag nation warrants that the ship has complied with international standards, and vessels with those certificates may enter ports of the signatory nations. Brief for United States 3.

Illustrative of treaties and agreements to which the United States is a party are the International Convention for the Safety of Life at Sea, 1974, 32 U. S. T. 47, T. I. A. S. No. 9700, the International Convention for Prevention of Pollution from Ships, 1973, S. Exec. Doc. C, 93–1, 12 I. L. M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C, 96–1, 17

I. L. M. 546, and the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, With Annex, 1978 (STCW), S. Exec. Doc. EE, 96–1, C. T. I. A. No. 7624.

The United States argues that these treaties, as the supreme law of the land, have pre-emptive force over the state regulations in question here. We need not reach that issue at this stage of the case because the state regulations we address in detail below are pre-empted by federal statute and regulations. The existence of the treaties and agreements on standards of shipping is of relevance, of course, for these agreements give force to the longstanding rule that the enactment of a uniform federal scheme displaces state law, and the treaties indicate Congress will have demanded national uniformity regarding maritime commerce. See *Ray*, 435 U. S., at 166 (recognizing Congress anticipated "arriving at international standards for building tank vessels" and understanding "the Nation was to speak with one voice" on these matters). In later proceedings, if it is deemed necessary for full disposition of the case, it should be open to the parties to argue whether the specific international agreements and treaties are of binding, pre-emptive force. We do not reach those questions, for it may be that pre-emption principles applicable to the basic federal statutory structure will suffice, upon remand, for a complete determination.

## III

In *Ray* v. *Atlantic Richfield, supra,* the Court was asked to review, in light of an established federal and international regulatory scheme, comprehensive tanker regulations imposed by the State of Washington. The Court held that the PWSA and Coast Guard regulations promulgated under that Act pre-empted a state pilotage requirement, Washington's limitation on tanker size, and tanker design and construction rules.

In these cases, petitioners relied on *Ray* to argue that Washington's more recent state regulations were pre-empted as well. The Court of Appeals, however, concluded that *Ray* retained little validity in light of subsequent action by Congress. We disagree. The *Ray* Court's interpretation of the PWSA is correct and controlling. Its basic analytic structure explains why federal pre-emption analysis applies to the challenged regulations and allows scope and due recognition for the traditional authority of the States and localities to regulate some matters of local concern.

At the outset, it is necessary to explain that the essential framework of *Ray*, and of the PWSA which it interpreted, are of continuing force, neither having been superseded by subsequent authority relevant to these cases. In narrowing the pre-emptive effect given the PWSA in *Ray*, the Court of Appeals relied upon OPA's saving clauses, finding in their language a return of authority to the States. Title I of OPA contains two saving clauses, stating:

"(a) Preservation of State authorities . . .

"Nothing in this Act or the Act of March 3, 1851 shall—

"(1) affect, or be construed or interpreted as pre-empting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

"(A) the discharge of oil or other pollution by oil within such State . . . .

.     .     .     .     .

"(c) Additional requirements and liabilities; penalties

"Nothing in this Act, the Act of March 3, 1851 (46 U. S. C. 183 et seq.), or section 9509 of [the Internal Revenue Code of 1986 (26 U. S. C. 9509)], shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—

"(1) to impose additional liability or additional requirements

"relating to the discharge, or substantial threat of a discharge, of oil." 33 U. S. C. § 2718.

The Court of Appeals placed more weight on the saving clauses than those provisions can bear, either from a textual standpoint or from a consideration of the whole federal regulatory scheme of which OPA is but a part.

The saving clauses are found in Title I of OPA, captioned Oil Pollution Liability and Compensation and creating a liability scheme for oil pollution. In contrast to the Washington rules at issue here, Title I does not regulate vessel operation, design, or manning. Placement of the saving clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport. The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills. See *Gutierrez* v. *Ada*, 528 U. S. 250, 255 (2000) (words of a statute should be interpreted consistent with their neighbors to avoid giving unintended breadth to an Act of Congress).

Our conclusion is fortified by Congress' decision to limit the saving clauses by the same key words it used in declaring the scope of Title I of OPA. Title I of OPA permits recovery of damages involving vessels "from which oil is discharged, or which pos[e] the substantial threat of a discharge of oil." 33 U. S. C. § 2702(a). The saving clauses, in parallel manner, permit States to impose liability or requirements "relating to the discharge, or substantial threat of a discharge, of oil." § 2718(c). In its titles following Title I, OPA addresses matters including licensing and certificates of registry, 104 Stat.

509; duties of senior licensed officers to relieve the master, *id.*, at 511; manning standards for foreign vessels, *id.*, at 513; reporting of marine casualties, *ibid.*; minimum standards for plating thickness, *id.*, at 515; tank vessel manning requirements, *id.*, at 517; and tank vessel construction standards, *id.*, at 517–518, among other extensive regulations. If Congress had intended to disrupt national uniformity in all of these matters, it would not have done so by placement of the saving clauses in Title I.

The saving clauses are further limited in effect to "this Act, the Act of March 3, 1851 . . . , or section 9509 of [the Internal Revenue Code]." §§ 2718(a) and (c). These explicit qualifiers are inconsistent with interpreting the saving clauses to alter the pre-emptive effect of the PWSA or regulations promulgated thereunder. The text of the statute indicates no intent to allow States to impose wide-ranging regulation of the at-sea operation of tankers. The clauses may preserve a State's ability to enact laws of a scope similar to Title I, but do not extend to subjects addressed in the other titles of the Act or other acts.

Limiting the saving clauses as we have determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the States retain concurrent powers and those over which the federal authority displaces state control. We have upheld state laws imposing liability for pollution caused by oil spills. See *Askew* v. *American Waterways Operators, Inc.*, 411 U. S., at 325. Our view of OPA's saving clauses preserves this important role for the States, which is unchallenged here. We think it quite unlikely that Congress would use a means so indirect as the saving clauses in Title I of OPA to upset the settled division of authority by allowing States to impose additional unique substantive regulation on the at-sea conduct of vessels. We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law. See, *e. g., Morales*

v. *Trans World Airlines, Inc.*, 504 U. S. 374, 385 (1992); *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214, 227–228 (1998).

From the text of OPA and the long-established understanding of the appropriate balance between federal and state regulation of maritime commerce, we hold that the pre-emptive effect of the PWSA and regulations promulgated under it are not affected by OPA. We doubt Congress will be surprised by our conclusion, for the Conference Report on OPA shared our view that the statute "does not disturb the Supreme Court's decision in *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151 (1978)." H. R. Conf. Rep. No. 101–653, p. 122 (1990). The holding in *Ray* also survives the enactment of OPA undiminished, and we turn to a detailed discussion of that case.

As we mentioned above, the *Ray* Court confronted a claim by the operator of a Puget Sound refinery that federal law precluded Washington from enforcing laws imposing certain substantive requirements on tankers. The *Ray* Court prefaced its analysis of the state regulations with the following observation:

> "The Court's prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)." 435 U. S., at 157.

The fragmentary quote from *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947), does not support the scope given to it by the Court of Appeals or by respondents.

*Ray* quoted but a fragment of a much longer paragraph found in *Rice*. The quoted fragment is followed by extensive and careful qualifications to show the different ap-

proaches taken by the Court in various contexts. We need not discuss that careful explanation in detail, however. To explain the full intent of the *Rice* quotation, it suffices to quote in full the sentence in question and two sentences preceding it. The *Rice* opinion stated: "The question in each case is what the purpose of Congress was. Congress legislated here in a field which the States have traditionally occupied. So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 331 U. S., at 230 (citations omitted).

The qualification given by the word "so" and by the preceding sentences in *Rice* are of considerable consequence. As *Rice* indicates, an "assumption" of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence. See also *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977) ("assumption" is triggered where "the field which Congress is said to have pre-empted has been traditionally occupied by the States"); *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 485 (1996) (citing *Rice* in case involving medical negligence, a subject historically regulated by the States). In *Ray*, and in the case before us, Congress has legislated in the field from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme.

The state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce. No artificial presumption aids us in determining the scope of appropriate local regulation under the PWSA, which, as we discuss below, does preserve, in Title I of that Act, the historic role of the States to regulate local ports and waters

under appropriate circumstances. At the same time, as we also discuss below, uniform, national rules regarding general tanker design, operation, and seaworthiness have been mandated by Title II of the PWSA.

The *Ray* Court confirmed the important proposition that the subject and scope of Title I of the PWSA allows a State to regulate its ports and waterways, so long as the regulation is based on "the peculiarities of local waters that call for special precautionary measures." 435 U. S., at 171. Title I allows state rules directed to local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway. *Ibid.* There is no preemption by operation of Title I itself if the state regulation is so directed and if the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate. This principle is consistent with recognition of an important role for States and localities in the regulation of the Nation's waterways and ports. *E. g., Cooley*, 12 How., at 319 (recognizing state authority to adopt plans "applicable to the local peculiarities of the ports within their limits"). It is fundamental in our federal structure that States have vast residual powers. Those powers, unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those of the National Government. *McCulloch v. Maryland*, 4 Wheat. 316 (1819).

As *Ray* itself made apparent, the States may enforce rules governed by Title I of the PWSA unless they run counter to an exercise of federal authority. The analysis under Title I of the PWSA, then, is one of conflict pre-emption, which occurs "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.'" *California v. ARC America Corp.*, 490 U. S. 93, 100–101 (1989) (citations omitted). In this context, Coast Guard regulations are to be given pre-

emptive effect over conflicting state laws. *City of New York v. FCC*, 486 U. S. 57, 63–64 (1988) (" '[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law"). *Ray* defined the relevant inquiry for Title I pre-emption as whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all. 435 U. S., at 171–172; see also *id.*, at 178 (" '[W]here failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation. *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767, 774 (1947)"). *Ray* also recognized that, even in the context of a regulation related to local waters, a federal official with an overview of all possible ramifications of a particular requirement might be in the best position to balance all the competing interests. *Id.*, at 177.

While *Ray* explained that Congress, in Title I of the PWSA, preserved state authority to regulate the peculiarities of local waters if there was no conflict with federal regulatory determinations, the Court further held that Congress, in Title II of the PWSA, mandated federal rules on the subjects or matters there specified, demanding uniformity. *Id.*, at 168 ("Title II leaves no room for the States to impose different or stricter design requirements than those which Congress has enacted with the hope of having them internationally adopted or has accepted as the result of international accord. A state law in this area . . . would frustrate the congressional desire of achieving uniform, international standards"). Title II requires the Coast Guard to impose national regulations governing the general seaworthiness of tankers and their crews. *Id.*, at 160. Under *Ray*'s inter-

pretation of the Title II PWSA provision now found at 46 U. S. C. § 3703(a), only the Federal Government may regulate the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels.

In *Ray*, this principle was applied to hold that Washington's tanker design and construction rules were pre-empted. Those requirements failed because they were within a field reserved for federal regulation under 46 U. S. C. § 391a (1982 ed.), the predecessor to § 3703(a). We reaffirm *Ray*'s holding on this point. Contrary to the suggestion of the Court of Appeals, the field of pre-emption established by § 3703(a) cannot be limited to tanker "design" and "construction," terms which cannot be read in isolation from the other subjects found in that section. Title II of the PWSA covers "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels. *Ibid.* Congress has left no room for state regulation of these matters. See *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141 (1982) (explaining field pre-emption). As the *Ray* Court stated: "[T]he Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment. Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers." 435 U. S., at 165.

The existence of some overlapping coverage between the two titles of the PWSA may make it difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to Title II. The *Ray* Court acknowledged the difficulty, but declined to resolve every question by the greater pre-emptive force of Title II. We follow the same approach, and conflict pre-emption under

Title I will be applicable in some, although not all, cases. We recognize that the terms used in § 3703(a) are quite broad. In defining their scope, and the scope of the resulting field pre-emption, it will be useful to consider the type of regulations the Secretary has actually promulgated under the section, as well as the section's list of specific types of regulation that must be included. Useful inquiries include whether the rule is justified by conditions unique to a particular port or waterway. See *id.*, at 175 (a Title I regulation is one "based on water depth in Puget Sound or on other local peculiarities"). Furthermore, a regulation within the State's residual powers will often be of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule. Limited extraterritorial effect explains why *Ray* upheld a state rule requiring a tug escort for certain vessels, *id.*, at 171, and why state rules requiring a registered vessel (*i. e.*, one involved in foreign trade) to take on a local pilot have historically been allowed, *id.*, at 159–160. Local rules not pre-empted under Title II of the PWSA pose a minimal risk of innocent noncompliance, do not affect vessel operations outside the jurisdiction, do not require adjustment of systemic aspects of the vessel, and do not impose a substantial burden on the vessel's operation within the local jurisdiction itself.

## IV

The field pre-emption rule surrounding Title II and § 3703(a) and the superseding effect of additional federal statutes are illustrated by the pre-emption of four of Washington's tanker regulations. We address these because the attempted reach of the state rules is well demonstrated by the briefs and record before us; other parts of the state regulatory scheme can be addressed on remand.

First, Washington imposes a series of training requirements on a tanker's crew. WAC § 317–21–230; see also Appendix, *infra,* at 118. A covered vessel is required to certify

that its crew has "complete[d] a comprehensive training program approved by the [State]." The State requires the vessel's master to "be trained in shipboard management" and licensed deck officers to be trained in bridge resource management, automated radar plotting aids, shiphandling, crude oil washing, inert gas systems, cargo handling, oil spill prevention and response, and shipboard fire fighting. The state law mandates a series of "weekly," "monthly," and "quarterly" drills.

This state requirement under WAC § 317–21–230 does not address matters unique to the waters of Puget Sound. On the contrary, it imposes requirements that control the staffing, operation, and manning of a tanker outside of Washington's waters. The training and drill requirements pertain to "operation" and "personnel qualifications" and so are pre-empted by 46 U. S. C. § 3703(a). Our conclusion that training is a field reserved to the Federal Government receives further confirmation from the circumstance that the STCW Convention addresses "training" and "qualification" requirements of the crew, Art. VI, and that the United States has enacted crew training requirements. *E. g.*, 46 CFR pts. 10, 12, 13, 15 (1999).

The second Washington rule we find pre-empted is WAC § 317–21–250; see also Appendix, *infra*, at 119. Washington imposes English language proficiency requirements on a tanker's crew. This requirement will dictate how a tanker operator staffs the vessel even from the outset of the voyage, when the vessel may be thousands of miles from Puget Sound. It is not limited to governing local traffic or local peculiarities. The State's attempted rule is a "personnel qualification" pre-empted by § 3703(a) of Title II. In addition, there is another federal statute, 33 U. S. C. § 1228(a)(7), on the subject. It provides: "[N]o vessel . . . shall operate in the navigable waters of the United States . . . , if such vessel . . . while underway, does not have at least one licensed deck officer on the navigation bridge

who is capable of clearly understanding English." The statute may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves.

The third Washington rule we find invalid under field preemption is a navigation watch requirement in WAC § 317–21–200; see also Appendix, *infra*, at 118. Washington has different rules for navigation watch, depending on whether the tanker is operating in restricted visibility or not. We mention the restricted visibility rule below, but now evaluate the requirement which applies in general terms and reads: "[T]he navigation watch shall consist of at least two licensed deck officers, a helmsman, and a lookout." The general watch requirement is not tied to the peculiarities of Puget Sound; it applies throughout Washington's waters and at all times. It is a general operating requirement and is preempted as an attempt to regulate a tanker's "operation" and "manning" under 46 U. S. C. § 3703(a).

We have illustrated field pre-emption under § 3703(a) by discussing three of Washington's rules which, under the current state of the record, we can determine cannot be enforced due to the assertion of federal authority found in that section. The parties discuss other federal statutory provisions and international agreements which also govern specific aspects of international maritime commerce. In appropriate circumstances, these also may have pre-emptive effect.

For example, the record before us reveals that a fourth state rule cannot stand in light of other sources of federal regulation of the same subject. Washington requires vessels that ultimately reach its waters to report certain marine casualties. WAC § 317–21–130; see also Appendix, *infra*, at 117–118. The requirement applies to incidents (defined as a "collision," "allision," "near-miss incident," "marine casualty" of listed kinds, "accidental or intentional grounding," "failure of the propulsion or primary steering systems,"

"failure of a component or control system," "fire, flood, or other incident that affects the vessel's seaworthiness," and "spills of oil"), regardless of where in the world they might have occurred. A vessel operator is required by the state regulation to make a detailed report to the State on each incident, listing the date, location, and weather conditions. The report must also list the government agencies to whom the event was reported and must contain a "brief analysis of any known causes" and a "description of measures taken to prevent a reoccurrence." WAC § 317-21-130.

The State contends that its requirement is not pre-empted because it is similar to federal requirements. This is an incorrect statement of the law. It is not always a sufficient answer to a claim of pre-emption to say that state rules supplement, or even mirror, federal requirements. The Court observed this principle when Commerce Clause doctrine was beginning to take shape, holding in *Sinnot* v. *Davenport*, 22 How. 227 (1859), that Alabama could not require vessel owners to provide certain information as a condition of operating in state waters even though federal law also required the owner of the vessel "to furnish, under oath, . . . all the information required by this State law." *Id.*, at 242. The appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation. On this point, Justice Holmes' later observation is relevant: "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." *Charleston & Western Carolina R. Co.* v. *Varnville Furniture Co.*, 237 U. S. 597, 604 (1915).

We hold that Congress intended that the Coast Guard regulations be the sole source of a vessel's reporting obligations with respect to the matters covered by the challenged state statute. Under 46 U. S. C. § 6101, the Coast Guard "shall

prescribe regulations on the marine casualties to be reported and the manner of reporting," and the statute lists the kinds of casualties that the regulations must cover. See also § 3717(a)(4) (requiring the Secretary of Transportation to "establish a marine safety information system"). Congress did not intend its reporting obligations to be cumulative to those enacted by each political subdivision whose jurisdiction a vessel enters. The State's reporting requirement is a significant burden in terms of cost and the risk of innocent noncompliance. *The Roanoke*, 189 U. S. 185, 195 (1903) (the master of a vessel is in a position "such that it is almost impossible for him to acquaint himself with the laws of each individual State he may visit"). Furthermore, it affects a vessel operator's out-of-state obligations and conduct, where a State's jurisdiction and authority are most in doubt. The state reporting requirement under WAC § 317–21–130 is pre-empted.

V

As to conflict pre-emption under Title I, Washington argues that certain of its regulations, such as its watch requirement in times of restricted visibility, are of limited extraterritorial effect and necessary to address the peculiarities of Puget Sound. On remand, the Court of Appeals or District Court should consider whether the remaining regulations are pre-empted under Title I conflict pre-emption or Title II field pre-emption, or are otherwise pre-empted by these titles or under any other federal law or international agreement raised as possible sources of pre-emption.

We have determined that Washington's regulations regarding general navigation watch procedures, English language skills, training, and casualty reporting are pre-empted. Petitioners make substantial arguments that the remaining regulations are pre-empted as well. It is preferable that the remaining claims be considered by the Court of Appeals or by the District Court within the framework we have discussed. The United States did not participate in

these cases until appeal. Resolution of these cases would benefit from the development of a full record by all interested parties.

We infer from the record that Washington is not now enforcing its regulations. If, pending adjudication of these cases on remand, a threat of enforcement emerges, the Court of Appeals or the District Court would weigh any application for stay under the appropriate legal standards in light of the principles we have discussed and with recognition of the national interests at stake.

When one contemplates the weight and immense mass of oil ever in transit by tankers, the oil's proximity to coastal life, and its destructive power even if a spill occurs far upon the open sea, international, federal, and state regulation may be insufficient protection. Sufficiency, however, is not the question before us. The issue is not adequate regulation but political responsibility; and it is, in large measure, for Congress and the Coast Guard to confront whether their regulatory scheme, which demands a high degree of uniformity, is adequate. States, as well as environmental groups and local port authorities, will participate in the process. See 46 U. S. C. § 3703(a) (requiring the Coast Guard to consider the views of "officials of State and local governments," "representative of port and harbor authorities," and "representatives of environmental groups" in arriving at national standards).

The judgment of the Court of Appeals is reversed, and these cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT

"1. Event Reporting—WAC 317–21–130. Requires operators to report all events such as collisions, allisions and near-miss incidents for the five years preceding filing of a

prevention plan, and all events that occur thereafter for tankers that operate in Puget Sound.

"2. Operating Procedures—Watch Practices—[WAC 317-21-200]. Requires tankers to employ specific watch and lookout practices while navigating and when at anchor, and requires a bridge resource management system that is the 'standard practice throughout the owner's or operator's fleet,' and which organizes responsibilities and coordinates communication between members of the bridge.

"3. Operating Procedures—Navigation—WAC 317-21-205. Requires tankers in navigation in state waters to record positions every fifteen minutes, to write a comprehensive voyage plan before entering state waters, and to make frequent compass checks while under way.

"4. Operating Procedures—Engineering—WAC 317-21-210. Requires tankers in state waters to follow specified engineering and monitoring practices.

"5. Operating Procedures—Prearrival Tests and Inspections—WAC 317-21-215. Requires tankers to undergo a number of tests and inspections of engineering, navigation and propulsion systems twelve hours or less before entering or getting underway in state waters.

"6. Operating Procedures—Emergency Procedures—WAC 317-21-220. Requires tanker masters to post written crew assignments and procedures for a number of shipboard emergencies.

"7. Operating Procedures—Events—WAC 317-21-225. Requires that when an event transpires in state waters, such as a collision, allision or near-miss incident, the operator is prohibited from erasing, discarding or altering the position plotting records and the comprehensive written voyage plan.

"8. Personnel Policies—Training—WAC 317-21-230. Requires operators to provide a comprehensive training program for personnel that goes beyond that necessary to obtain a license or merchant marine document, and which includes instructions on a number of specific procedures.

"9. Personnel Policies—Illicit Drugs and Alcohol Use—WAC 317-21-235. Requires drug and alcohol testing and reporting.

"10. Personnel Policies—Personnel Evaluation—WAC 317-21-240. Requires operators to monitor the fitness for duty of crew members, and requires operators to at least annually provide a job performance and safety evaluation for all crew members on vessels covered by a prevention plan who serve for more than six months in a year.

"11. Personnel Policies—Work Hours—WAC 317-21-245. Sets limitations on the number of hours crew members may work.

"12. Personnel Policies—Language—WAC 317-21-250. Requires all licensed deck officers and the vessel master to be proficient in English and to speak a language understood by subordinate officers and unlicensed crew. Also requires all written instruction to be printed in a language understood by the licensed officers and unlicensed crew.

"13. Personnel Policies—Record Keeping—WAC 317-21-255. Requires operators to maintain training records for crew members assigned to vessels covered by a prevention plan.

"14. Management—WAC 317-21-260. Requires operators to implement management practices that demonstrate active monitoring of vessel operations and maintenance, personnel training, development, and fitness, and technological improvements in navigation.

"15. Technology—WAC 317-21-265. Requires tankers to be equipped with global positioning system receivers, two separate radar systems, and an emergency towing system.

"16. Advance Notice of Entry and Safety Reports—WAC 317-21-540. Requires at least twenty-four hours notice prior to entry of a tanker into state waters, and requires that the notice report any conditions that pose a hazard to the vessel or the marine environment." 148 F. 3d, at 1057-1058 (footnote omitted).