# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 20, 2014 Session

## STATE OF TENNESSEE v. DEMARCUS ANT-JUAN NELSON

**Appeal from the Criminal Court for Knox County**
**No. 99692     Steven W. Sword, Judge**

---

**No. E2013-01414-CCA-R3-CD - Filed August 18, 2014**

---

Demarcus Ant-Juan Nelson ("the Defendant") pleaded guilty to possession with intent to sell .5 grams or more of a substance containing cocaine within 1000 feet of a school. Pursuant to the plea agreement, the trial court sentenced the Defendant to twenty years' incarceration. The plea agreement provided for reservation of a certified question of law as to whether the Defendant's seizure was lawful. After a thorough review of the record and the applicable law, we conclude that the Defendant is entitled to no relief. However, we remand this matter to the trial court for entry of corrected judgment orders indicating that count two was dismissed. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed; Remanded**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

A. Philip Lomonaco, Knoxville, Tennessee, for the appellant, Demarcus Ant-Juan Nelson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Knox County Grand Jury indicted the Defendant on one count of possession with intent to sell and one count of possession with intent to deliver .5 grams or more of a substance containing cocaine within 1000 feet of a school. See Tenn. Code Ann. §§ 39-17-

417, 432 (2010). The Defendant filed a motion to suppress evidence that he alleged was recovered as a result of his illegal seizure.

At the suppression hearing, Officer Brandon Stryker with the Knoxville Police Department ("KPD") testified. At the time of the events in question, Officer Stryker was assigned to the "repeat offender squad," which was "tasked with investigations dealing with narcotics, gangs, prostitution, gambling, [and] things of that nature." He had experience and training investigating narcotics cases and personally had witnessed numerous narcotics transactions. Officer Stryker testified that he had a "very intimate knowledge" of a particular residence located at 301 Cansler Avenue ("the residence") because it had been "a chronic problem for drug transactions . . . specifically, the front porch of that residence." The repeat offender squad had conducted at least seven undercover purchases of cocaine at the residence, and Officer Stryker personally was involved with two of those operations. Officer Stryker also testified that it was "common knowledge" that the residence was a "hangout" for a gang known as the "Five Deuce Hoover Crips."

On February 27, 2012, Officer Stryker went to the residence with another officer, Sergeant Shaffer, in order to execute several arrest warrants for individuals known to "either live or loiter" there. The warrants were all for selling narcotics. Sergeant Shaffer drove by the residence in an unmarked vehicle and "confirmed that at least two of those individuals that he had an outstanding warrant on were present on the front porch." Officer Stryker drove up to the residence along with Sergeant Shaffer and three other officers. All of the officers were wearing plain clothes, a badge, and vests that said "police" on them in large letters. As they drove up, Officer Stryker observed several individuals on the porch, but he could not identify them. They parked on the side of the residence approximately ten to fifteen feet from the front porch. Officer Stryker testified, "[I]mmediately, as I exited the vehicle, I observed the [D]efendant run to the rear of [the residence]. Run to the rear towards the alley." Officer Stryker pursued the Defendant. Officer Stryker recalled that, as the Defendant turned and continued down an alley, he observed the Defendant "throw a couple of small items onto the roof of the front porch of 324 Douglas Avenue," which was nearby behind the residence. At that point, Officer Stryker ordered the Defendant to stop, and the Defendant complied.

After the Defendant stopped, Officer Stryker arrested and searched him. The search did not uncover anything of significance. Officer Stryker testified,

> I reasonably thought that [the Defendant] had thrown narcotics immediately, and I contacted the Knoxville Fire Department and requested their assistance to get a ladder to get on top of that porch. They responded,

and then I utilized one of their ladders, and I personally walked up the ladder to the top of the porch where I found two small baggies.

Officer Stryker's belief that the Defendant had thrown narcotics was based on his experience, the behavior he observed, and the history of the residence as a center of narcotics and gang activity. From the roof, Officer Stryker recovered one bag of a rock-like substance weighing approximately 3.2 grams and one bag of a powder substance weighing 5.1 grams.

On cross-examination, Officer Stryker denied that he shouted "police" as he exited his vehicle, but he believed that one of the other officers may have done so. Multiple police vehicles, some of them marked, also arrived at the residence around the same time as the vehicle in which Officer Stryker was riding. He confirmed that one of the other individuals on the porch was arrested pursuant to the outstanding warrants. Officer Stryker testified that his initial intention upon exiting the car was to determine the Defendant's identity. He testified, "[O]nce [the Defendant] ran, I reasonably believed that he was one of the individuals named in that presentment or — and/or was in possession of narcotics, based on my previous experience with that residence." Officer Stryker stated that he never "got a good look" at the Defendant before he ran. Officer Stryker did have a weapon when he was chasing the Defendant and, when he ordered the Defendant to stop, Officer Stryker warned the Defendant that he would shoot if the Defendant did not stop.

In response to questions by the court, Officer Stryker clarified that, although he could not be sure, he believed that it was "more than likely" that the Defendant began to run before "police" was shouted.

Following the suppression hearing, the trial court issued a written order denying relief. The trial court concluded, based on the fact that the "atmosphere of a fast showing of overwhelming police force, with the intent to serve arrest warrants at a known drug location," that "the [D]efendant was seized when Officer Stryker began chasing the [D]efendant." Based on the totality of the circumstances, the trial court concluded that the seizure constituted a brief investigatory stop requiring reasonable suspicion supported by specific and articulable facts. In determining whether Officer Stryker had reasonable suspicion, the trial court noted,

Officer Stryker testified to a lengthy investigation concerning drug and gang activity on this very porch. Drug transactions had actually been videotaped occurring at this location. The officer had personally conducted three out of seven controlled buys here. This was not the [D]efendant's home. In addition, the officer had reason to believe that a specific gang was using this location for conducting their illegal activity.

-3-

The trial court further considered "the [D]efendant's unprovoked flight" and also found that "Officer Stryker had reason to believe that the fleeing individual was one of the wanted persons" for whom the officers had a warrant. Based on all of this, the trial court held that Officer Stryker had reasonable suspicion based on specific and articulable facts that the Defendant was engaged in criminal activity and concluded that the seizure was lawful. Accordingly, the trial court denied the Defendant's motion to suppress.

The Defendant pleaded guilty to one count of possession with intent to sell .5 grams or more of a substance containing cocaine within 1000 feet of a school.[1] Pursuant to the plea agreement, the trial court sentenced the Defendant to twenty years' incarceration. As a part of that plea agreement, the Defendant reserved a certified question of law as to whether the seizure of the Defendant was lawful.

## Analysis

As a general rule, a criminal defendant who enters a plea of guilty waives the right to an appeal. State v. McKissack, 917 S.W.2d 714, 714 (Tenn. Crim. App. 1995); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). However, under Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, a defendant may appeal a certified question of law "that is dispositive of the case" where that question was "explicitly reserved with the consent of the state and of the court." Tenn. R. Crim. P. 37(b)(2)(A). Pursuant to the prerequisites of Rule 37(b)(2)(A), we hold that the Defendant properly preserved the certified question of law: "[W]hether the drugs found and attributed to the Defendant were a result of an unreasonable seizure or was any seizure based on reasonable suspicion." Therefore, we proceed to consider the question on the merits.

When conducting a review of a trial court's determinations from a suppression hearing, we will uphold the trial court's findings of fact unless the preponderance of the evidence is otherwise. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasona ble and legitimate inferences that may be drawn from that evidence." Id. However, "a trial court's conclusions of law" and "mixed questions of law and fact" are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

---

[1] The record before us indicates that count two was dismissed. See infra.

The Defendant asserts that, the moment that Officer Stryker began his pursuit of the Defendant, there was a seizure constituting an investigatory stop for which Officer Stryker lacked the requisite reasonable suspicion. According to the Defendant, "Officer Stryker cannot articulate a particularized and objective basis for suspecting the particular person stopped of criminal activity."

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. State v. Ingram, 331 S.W.3d 746, 754 (Tenn. 2011) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).[2] There are three categories of interactions between police and private citizens: "(1) a full-scale arrest, which requires probable cause"; (2) "a brief investigatory detention, requiring reasonable suspicion of wrongdoing"; and (3) "a brief police-citizen encounter, requiring no objective justification." State v. Moats, 403 S.W.3d 170, 178 (Tenn. 2013) (citations omitted); see also Terry v. Ohio, 392 U.S. 1, 25-26 (1968); United States v. Mendenhall, 446 U.S. 544, 553 (1980); State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008); State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). Of these three categories, only the first two constitute a "seizure" within the meaning of the Fourth Amendment, and, therefore, only those two categories implicate constitutional protections. Day, 263 S.W.3d at 901; Nicholson, 188 S.W.3d at 656. Accordingly, we must first determine whether and at what point the Defendant was "seized" within the meaning of the Fourth Amendment and article I, section 7 of the Tennessee Constitution.

In State v. Randolph, 74 S.W.3d 330, 36-37 (Tenn. 2002), our supreme court held that the proper analysis of when a person has been seized under article I, section 7 of the Tennessee Constitution is "a totality of the circumstances analysis" such that "'a seizure implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.'" Id. (quoting State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000)). Our supreme court has identified numerous factors that are relevant to the totality of the circumstances test:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several

---

[2] The Fourth Amendment is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Mapp, 367 U.S. at 655; Ingram, 331 S.W.3d at 754. The intent and purpose of article I, section 7 of the Tennessee Constitution is identical with the Fourth Amendment; however, our Supreme Court previously has noted that Tennessee's search and seizure case law has developed independently from, and extends greater protection than, federal law. See State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009).

officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Daniel, 12 S.W.3d at 425-26. Furthermore, our supreme court also has listed a variety of police encounters which constitute seizures:

[where the officer] (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

Id. at 426; see also Randolph, 74 S.W.3d at 337. In Randolph, our supreme court held that a defendant was seized "when the officer made a show of authority by activating the blue lights on his patrol car and instructing him to stop." Randolph, 74 S.W.3d at 338.

In the instant case, Officer Stryker testified that he and several other officers parked their vehicle in front of the residence near where the Defendant was standing on the front porch. Officer Stryker and the other officer simultaneously exited the vehicle wearing badges and vests with "police" on them in large letters, and Officer Stryker had his service weapon. At the same time, multiple other marked vehicles also arrived and parked in the area immediately surrounding the residence. The purpose of the encounter was to serve arrest warrants on suspects known to frequent the residence. As soon as Officer Stryker exited the vehicle, the Defendant began to run, and Officer Stryker gave chase. It is apparent from these facts that the Defendant attempted to terminate the encounter by fleeing, and Officer Stryker pursued him. Based on those circumstances, we hold that the Defendant was "seized" within the meaning of the Fourth Amendment and article I, section 7 of the Tennessee Constitution at the moment Officer Stryker began to pursue the Defendant. See Daniel, 12 S.W.3d at 425-26 (holding that an officer's pursuit of an "individual who has attempted to terminate the contact by departing" constitutes a seizure).

Having found that the Defendant was "seized" within the meaning of the federal and Tennessee Constitutions at the time Officer Stryker began his pursuit, we next must determine whether the circumstances justified the warrantless seizure. "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citation omitted); see also State v. Binette, 33

S.W.3d 215, 217 (Tenn. 2000)). One such exception arises "when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." Binette, 33 S.W.3d at 218; see also Terry, 392 U.S. at 20-21.

There is no precise technical definition of reasonable suspicion. Rather, it is a "common sense" concept. State v. Keith, 978 S.W.2d 861, 867 (Tenn. 1998) (citing Ornelas v. United States, 517 U,S, 690, 699 (1996)). Therefore, "[t]rial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a Terry stop." Moats, 403 S.W.3d at 178-79 (citing Binette, 33 S.W.3d at 218). Those circumstances include "an officer's observations, information from other law enforcement personnel or agencies, information for citizens, known patterns of criminal offenders, or deductions based upon experience." Id. at 179 (citing State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)). Furthermore, "the nature of the crime suspected may be a factor." Id. (citing State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998)). In supporting that suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch," however, "[t]hat level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." Keith, 978 S.W.2d at 867 (quoting United State v. Sokolow, 490 U.S. 1, 7-8 (1989)); see also Terry, 392 U.S. at 27. That is, "[a]n officer conducting an investigatory stop 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" Nicholson, 188 S.W.3d at 659 (quoting Terry, 392 U.S. at 21).

Our supreme court has held that flight by a suspect upon noticing police may contribute to reasonable suspicion of criminal activity. Id. Furthermore, the characteristics of a particular location as being associated with criminal activity "may be relevant to amassing reasonable suspicion." Id. (citing Illinois v Wardlow, 529 U.S. 119, 124 (2000) (holding that a suspect's flight from police officers in what was known to be a "high crime area" associated with "heavy narcotics trafficking" supported reasonable suspicion)). However, neither flight from police officers nor an individual's presence in a high crime area are enough alone to give rise to reasonable suspicion absent other articulable facts. Id.; State v. Lawson, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996).

In the instant case, Officer Stryker had information from fellow law enforcement officers that the residence had an extensive history of narcotics and gang activity, and Officer Stryker himself personally had witnessed criminal activity at the residence on multiple occasions. Officer Stryker testified that much of the criminal activity at the residence in the past had taken place on the front porch. Therefore, based on Officer Stryker's experience, multiple individuals standing on the front porch of the residence was a known pattern of

criminal activity. The fact that the Defendant immediately fled upon seeing the police contributed to Officer Stryker's suspicion that the Defendant was engaged in criminal activity. Furthermore, the reason that the officers were present on the scene was to execute multiple narcotics-related arrest warrants for individuals known to frequent the front porch of the residence. In fact, Officer Shaffer had surveilled the residence prior to executing the warrants and confirmed that at least two of the subjects of the outstanding warrants were present on the porch. Officer Stryker testified that the Defendant fled the scene so quickly that he was not able to get a good look at the Defendant in order to ascertain whether the Defendant was one of the suspects subject to the arrest warrants. At the time he began pursuing the Defendant, Officer Stryker was under the reasonable belief that the Defendant might be one of the subjects of the outstanding warrants.

Based on the specific and unique combination of facts in this case, we hold that Officer Stryker put forward "specific and articulable facts which, taken together with rational inferences from those facts" under the totality of the circumstances, gave rise to a reasonable suspicion at the time Officer Stryker began the pursuit that the Defendant was either engaged in narcotics related criminal activity or was attempting to flee arrest pursuant to a warrant. Nicholson, 188 S.W.3d at 659 (quoting Terry, 392 U.S. at 21). Therefore, we uphold the trial court's denial of the Defendant's motion to suppress.

The trial court indicated on the judgment order for count one that "count 2 merges with count 1." However, there is no judgment order for count two contained in the record. We also note that the plea agreement signed by the Defendant indicates that count two was dismissed. No transcript of the plea submission hearing was included in the record. Therefore, based on the record before us, we must conclude that count two was dismissed. Accordingly, we remand this case for correction of the judgment order in count one and entry of a judgment order in count two to indicate that count two was dismissed.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court. We remand this matter to the trial court for entry of corrected judgment orders indicating that count two was dismissed.

_____
JEFFREY S. BIVINS, SPECIAL JUDGE