**In re WORLD WAR II ERA JAPANESE FORCED LABOR LITIGATION.**

This Document Relates To:

Choe v. Nippon Steel Corp, et al.,

Kim v. Ishikawajima Harima Heavy Industries Co., Ltd., et al.,

Oh v. Mitsui & Co., Ltd., et al.,

Sin v. Mitsui & Co., Ltd., et al.,

Su v. Mitsubishi Corp., et al.,

Sung, et al. v. Mitsubishi Corp, et al.,

Ma v. Kajima Corp., et al.

No. MDL–1347.
Nos. 99–5309, 99–5303, 00–3752, 00–3242, 00–3586, 00–2358, 01–2592.

United States District Court,
N.D. California.

Sept. 17, 2001.

William S. Lerach, Frank J. Janecek, Elizabeth J. Arleo, Patrick W. Daniels, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, John J. Bartko, William I. Edlund, Bartko Zankel Tarrant & Miller, San Francisco, CA, Albert H. Meyerhoff, Milberg Weiss Bershad Hynes & Lerach LLP, Los Angeles, CA, Steve W. Berman, Jeffrey T. Sprung, Hagens Berman, P.S., Seattle, WA, Kevin P. Roddy, Hagens Berman LLP, Los Angeles, CA, Michael Goldstein, Law Offices of Michael Goldstein, Cardiff, CA, for World War II Era Japanese Forced Labor Litigation, Gloria Tyler Alfano, Shang-Ting Sung.

Daniel C. Girard, Anthony K. Lee, Gordon M. Fauth, Girard & Greene LLP, San Francisco, CA, Jay W. Eisenhofer, Grant & Eisenhofer, P.A., Wilmington, DE, for James O. King.

David S. Casey, Jr., Bonnie E Kane, Wendy M Behan, Herman Mathis Casey & Kitchens LLP, San Diego, CA, James W. Parkinson, Palm Desert, CA, Joe R Reeder, C Allen Foster, Greenberg Traurig, Washington, DC, Maury Herman, Russ M Herman, Leonard A Davis, David K Fox, Herman Middleton Casey & Kitchens LLP, New Orleans, LA, Ronald W Kleinman, Greenberg Traurig, Washington, DC, for Woodrow M. Hutchinson, Manuel A. Eneriz, Melody Solis, Harold W. Poole, Ernest Harold Liy, Robert C. Clark, Francis W., Clarence S. Kellogg, Harry Corre, Raymond Heimbuch, Vivian O. Johnson, William R. Lowe, Sam P. Buse, Alfred Berest, Edwin F. Lindros, Michael Bibin, J.S. Gray, Karl William Holt, Norman R. Matthews, Darrel D. Stark, Carmel Zipeto, Manuel A. Eneriz, Lester I. Tenney, Shirley M. Rubenstein, Julia E. Stevenson, Glen Leroy Bailey.

Scott W. Wellman, Wellman & Warren LLP, Irvine, CA, Robert A. Swift, Kohn Swift & Graf, Philadelphia, PA, Edward D. Fagan, Fagan & Associates, New York, NY, Scott R Warren, Wellman & Warren LLP Irvine, CA, Denis Sheils, Kohn Swift & Graf, PC, Philadelphia, PA, Michael Witti, Monchen (Bogenhausen), Germany, Henry Burstyner Glennen, Burstyner & CO, Melbourne, Australia, for Raymond Wheeler.

William S. Lerach, Frank J. Janecek, Elizabeth J. Arleo, Patrick W. Daniels, Milberg, Weiss, Bershad Hynes & Lerach LLP, San Diego, CA, Michael Rubin Altshuler, Berzon Nussbaum Rubin & Demain, San Francisco, CA, Howard D. Finkelstein, Finkelstein & Associates, San Diego, CA, Albert H. Meyerhoff, David R. Scott, Neil Rothstein, Scott & Scott, LLC, Colchester, CT, Jonathan W. Cuneo, Cuneo Law Group, P.C., Washington, DC, Steve W. Berman, Jeffrey T. Sprung, Hagens Berman, P.S., Seattle, WA, Henry H. Rossbacher, Rossbacher & Associates, Los Angeles, CA, Kevin P. Roddy, Hagens Berman, LLP, Los Angeles, CA, Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, L. Thomas Galloway, Galloway & Associates, Boulder, CO, for Finnie B. Price.

Dennis Sheils, Robert A. Swift, Kohn Swift & Graf, PC, Philadelphia, PA, Michael Witti, Henry Burstyner, Scott W Wellman, Scott R Warren, Wellman & Warren, Laguna Hills, CA, Edward D Fagan, Fagan & Associates, Livingston, NJ, Brent A Granado, Wellman & Warren LLP, Laguna Hills, CA, for Frank A. Mente, Neville J. Booker.

Michael Witti, Henry Burstyner, Scott W Wellman, Scott R Warren, Wellman & Warren, Laguna Hills, CA, Robert A.

Swift, Kohn Swift & Graf, Philadelphia, PA, Edward D Fagan, Fagan & Associates, Livingston, NJ, for H. Joseph Terrence.

Daniel C. Lieb, Samuel Leib, for Garth Dunn.

Paul F. Doyle, Kelley Drye & Warren, LLP, New York City, Sabina A. Helton, Kelley Drye & Warren LLP, Los Angeles, CA, for Ruben Resus, Carlos Cadenilla.

Christopher B. Hockett, Rebecca M. Archer, David M. Balbanian, McCutchen Doyle Brown & Enerson, LLP, San Francisco, CA, for Mitsui & Co., Ltd., Mitsui & Co. (USA), Inc.

Nathan Lane, III, Joseph A. Meckes, Squire Sanders & Dempsey LLP, San Francisco, CA, for Mitsui Engineering & Shipbuilding Co., Ltd., Paceco Corp., Ishihara Corp. (U.S.A.), ISK Americas, Inc.

Robert A. Sacks, Sullivan & Cromwell, Los Angeles, CA, for Nippin Steel USA Inc., Nippon Steel Corp., Nippon Steel Trading Co., Ltd., Nippon Steel Trading America.

Arne D. Wagner, Tamu K. Sudduth, Kathleen V. Fisher, Phyllis A. Oscar, Morrison & Foerster, LLP, San Francisco, CA, for Mitsubishi Corp., Mitsubishi Intern. Corp.

John H. Beisner, Teresa E. Dawson, John F. Niblock, Benjamin R Jacewicz, Carrielyn D Guymon, O'Melveny & Myers LLP, Washington, DC, for Mitsubishi Materials Corp., Mitsubishi Materials USA Corp.

Nathan M. Spatz, Barbara L Croutch, Michael J Finnegan, Pillsbury Winthrop LLP, Los Angeles, CA, Bruce E.H. Johnson, Davis Wright Tremaine, Seattle, WA, Martin L. Fineman, Davis Wright Tremaine, San Francisco, CA, Arthur W. Harrigan, Danielson Harrigan & Tollefson LLP, Seattle, WA, Richard R Holmquist, Danielson Harrigan & Tollefson LLP, Seattle, WA, for Mitsubishi Heavy Industries

Ltd., Mitsubishi Heavy Industries America, Inc.

Linda E. Shostak, Lloyd W. Aubry, Jr., Kathryn M Davis, Morrison & Foerster LLP, San Francisco, CA, for Ishikawajima Harima Heavy Industries Ltd., IHI, Inc.

Shannon M. Hansen, Kirkland & Ellis, Los Angeles, CA, Thomas D. Yannucci, James F. Basile, Christopher Landau, Brant W. Bishop, Kirkland & Ellis, Washington, DC, for Sumitomo Heavy Industries Ltd., Sumitomo Heavy Industries (USA), Inc.

Robert S. Mueller, III, U.S. Attorney's Office, San Francisco, CA, David J. Anderson, Vincent M. Garvey, Department of Justice, Civil Division, Washington, DC, David W. Ogden, U.S. Attorney's Office, Torts Branch - Civil Division, San Francisco, CA, Martha Rubio, U.S. Department of Justice, Civil Div., Washington, DC, for U.S.

Peter I. Ostroff, Ronald L. Steiner, Mark E Haddad, Sidley Austin Brown & Wood, Los Angeles, CA, for Nippon Sharyo Ltd., Nippon Sharyo U.S.A., Inc.

Douglas E. Mirell, Loeb & Loeb LLP, Los Angeles, CA, Joseph Geisman, Loeb & Loeb LLP, Los Angeles, CA, Matthew E. Digby, Heidi A Leider, Bingham Dana LLP, Los Angeles, CA, for Japan Energy Corp.

Neil A.F. Popovic, Stephen V. Bomse, Rakesh K. Anand, Heller Ehrman White & McAuliffe, San Francisco, CA, for Showa Denko America, Inc.

Matthew E. Digby, Heidi Leider, Bingham Dana, Los Angeles, CA, for Mitsui Mining USA, Inc., Mitsui Mining Co., Ltd.

Richard M. Frank, Louis Verdugo, Jr., CA Attorney General's Office, Oakland, CA, Bill Lockyer, CA Attorney General, Los Angeles, CA, Catherine Z Ysrael, At-

torney General, Los Angeles, CA,for People of State of California, amicus curiae.

WALKER, District Judge.

The seven above-captioned cases are the only class actions remaining before the court in a set of consolidated cases in which World War II veterans forced to labor without compensation during World War II seek damages and other remedies from Japanese corporations or their successors in interest. These cases are brought by plaintiffs of Korean and Chinese descent. The other matters, which involved United States and Allied veterans, were previously dismissed because the 1951 Treaty of Peace with Japan waived all such claims. *In re World War II Era Japanese Forced Labor Litigation*, 114 FSupp2d 939, 942 (N.D.Cal.2000) (Order No 4); see also Order No. 9. Defendants seek dismissal of the present cases as well.

The Korean and Chinese plaintiffs assert essentially the same claims as the United States and Allied veterans. Their primary cause of action arises under a statute enacted by the California legislature in 1999, California Code of Civil Procedure § 354.6. The statute attempts to provide a cause of action for all individuals forced to labor without compensation by "the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the [same regimes]" by extending the applicable statute of limitations to December 31, 2010. CalCCP § 354.6(a), (c). The crux of section 354.6 states:

> Any Second World War slave labor victim, or heir of a Second World War slave labor victim, Second World War forced labor victim, or heir of a Second World War forced labor victim, may bring an action to recover compensation for labor performed as a Second World War slave labor victim or Second World War forced labor victim from any entity or successor in interest thereof, for

whom that labor was performed, either directly or through a subsidiary or affiliate.

*Id.*, subsection (b). The statute does not limit the cause of action to California residents. See *id.*, subsection (a).

The Korean and Chinese plaintiffs also seek compensation and restitution under various other state laws, and two of the seven complaints assert violations of international law.

Defendants argue that these cases must be dismissed for several reasons. Most significantly, defendants contend that section 354.6 is unconstitutional as applied against them. Notice of Claim of Unconstitutionality (Doc # 243); DefBr (Doc # 210) at 19–21; DefSuppBr (Doc # 336) at 1; see also United States Statement of Interest (SOI) (Doc # 302) at 12–17. Defendants argue that application of the statute is unconstitutional because it infringes upon the federal government's exclusive power over foreign affairs and violates the Due Process clause of the Constitution.

Defendants also seek dismissal based on the following arguments: (1) the claims of these plaintiffs are barred by the applicable statute of limitations, (2) the 1951 Treaty of Peace with Japan and subsequent treaties entered by Japan with Korea and China combine to bar the claims, (3) the claims raise nonjusticiable political questions, (4) consideration of the claims violates the principles of international comity, (5) evaluating the claims would contravene the act of state doctrine, (6) the doctrine of forum non conviens precludes this litigation in California and (7) the claims contravene the doctrine of foreign sovereign immunity.

The court concludes that section 354.6 is unconstitutional as applied to defendants in the case at bar because it infringes on the federal government's exclusive power over foreign affairs. To the extent the

Korean and Chinese plaintiffs could assert claims under any other law, they are barred by the applicable statute of limitations and other principles of law.

## I

Defendants move to dismiss pursuant to both FRCP 12(b)(6) and 12(c). Defendants move under both provisions because, consistent with the defendants in the Allied matters, some of the defendants have filed answers in the present cases while others have not. As the court noted in Order No 4, the distinction between the two approaches is not important. The Ninth Circuit instructs that the standard for assessing a FRCP 12(c) motion is the same as the standard for a FRCP 12(b)(6) motion. See *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir.1997) (citations omitted). On such motions, all material allegations in the complaint at issue must be taken as true and construed in the light most favorable to the plaintiff. *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir.1994). Dismissal is only appropriate when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). These cases are subject to dismissal based on questions of law only.

## II

■ As touched upon above, the present cases involve plaintiffs of Korean and Chinese descent. These cases require analysis separate from the cases dismissed earlier not because the Korean and Chinese plaintiffs assert claims that are distinct from the claims of the United States and Allied veterans, but because the cases are brought on behalf of nationals of countries that were not signatories to the 1951 Treaty of Peace with Japan. The treaty was signed only by representatives of the United States and 47 other Allied powers and Japan. See Treaty of Peace with Japan, [1952] 3 UST 3169, TIAS No 2490 (1951) (hereinafter, Treaty). Due to various historical and political circumstances during the time the treaty was negotiated and finalized, neither Korea nor China became a signatory to the treaty. See U.S. Dept of State, Record of Proceedings at the Conference for the Conclusion and Signature of the Treaty of Peace with Japan 84–85 (1951) (Exhibits in Support of Motion to Dismiss (Doc # 212), Exh B). As the chief negotiator for the United States, John Foster Dulles explained at the time that Korea was not a signatory because technically Korea was part of Japan until the war ended, and thus "Korea was never at war with Japan." *Id.* at 84. With respect to China, Dulles likewise explained that it could not be brought to the negotiating table because "civil war within China and the attitudes of the Allied Governments *** created a situation such that there [was] not general international agreement upon a single Chinese voice with both the right and the power to bind the Chinese nation to terms of peace." *Id.* at 85.

Hence, although the treaty granted certain rights and benefits to Korea and China, the two countries simply were not signatories to the treaty. According to the plain text of the treaty, therefore, Korea and China do not qualify as "Allied Powers" subject to the waiver provision of Article 14(b). See Treaty at 3190. As a result, unlike the claims of the United States and Allied plaintiffs, the Treaty of Peace with Japan cannot be interpreted to waive the claims of the Korean and Chinese plaintiffs.

This circumstance creates a possible paradox that claims of non-Americans arising from forced labor experiences during World War II might be litigated in a court of the United States while the identical

claims of American and Allied veterans are barred by the treaty. That possibility lays bare the significant foreign policy questions implicated in these cases and compels the court to address the constitutionality of the statute upon which they are based.

A

Before reaching the constitutional issues presented by these cases, the court must address whether the claims of the Korean and Chinese plaintiffs made under section 354.6 are preempted by the Treaty of Peace with Japan. Although defendants simply suggest this in passing, see DefBr (Doc # 210) at 3–4, the United States asserts in its amicus curiae brief that the treaty preempts the claims of all non-Allied plaintiffs, see United States SOI (Doc # 302) at 9–12. The Korean and Chinese plaintiffs do not directly address this argument. Nevertheless, the Supreme Court instructs that federal courts faced with both statutory questions and constitutional questions should decide the former first in an attempt to avoid unnecessary constitutional inquiries. See *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 343–44, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (citations omitted); see also *Liberty Warehouse Co. v. Grannis*, 273 U.S. 70, 47 S.Ct. 282, 71 L.Ed. 541 (1927) (applying doctrine to a challenge to a state statute); *Mass. State Grange v. Benton*, 272 U.S. 525, 47 S.Ct. 189, 71 L.Ed. 387 (1926) (same).

As a preliminary matter, the court emphasizes that this inquiry is limited to whether the treaty preempts the claims of non-Allied plaintiffs only. To be sure, section 354.6 purports to provide a cause of action for other individuals as well. Indeed, section 354.6 appears to have been motivated mostly by a desire to give California, as opposed to foreign, "residents and citizens *** a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior

to and during the Second World War." CalCCP § 354.6, note § 1(c). But the only cases remaining before the court were brought by nationals of non-signatory nations. Accordingly, the question is not whether the treaty preempts section 354.6 generally, but whether the treaty preempts California's effort to supply a cause of action for non-Allied plaintiffs such as those of Korean and Chinese descent. This order addresses that issue only.

 Under Article VI of the Constitution, the laws of the United States are "the supreme Law of the Land; *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." US Const art VI, cl. 2. A treaty made by the President with the required approval of two-thirds of the Senate is part of the "supreme law of the land," and thus, similar to federal statutes, valid treaties override any conflicting state law. *Missouri v. Holland*, 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920); see also *Ware v. Hylton*, 3 U.S. (3 Dall) 199, 1 L.Ed. 568 (1796). A treaty prevails whether it is ratified before or after the enactment of the conflicting state law. Laurence H Tribe, *American Constitutional Law* § 4–4 at 645 (3d ed 2000) (hereinafter, Tribe) (citing *Nielsen v. Johnson*, 279 U.S. 47, 49 S.Ct. 223, 73 L.Ed. 607 (1929)).

 Although the Supreme Court has written extensively about when congressional acts have preemptive effect, see, eg, *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *United States v. Locke*, 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), it has provided little guidance on the preemptive effect of treaties. For acts of Congress, the Court provides that such legislation preempts state law when (1) Congress expressly provided for preemption, (2) Congress intend-

ed to "occupy the field," or (3) the state law conflicts with the congressional statute at issue. *Crosby,* 530 U.S. at 372, 120 S.Ct. 2288; see also *English v. General Elec. Co.,* 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (recognizing that these categories are not "rigidly distinct"). The Court has not established a similar detailed framework for courts to utilize when analyzing preemption by treaties. See, eg, *United States v. Belmont,* 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) (noting, without any analysis, that treaties trump conflicting state laws). The Court has stated, however, that this preemption framework should not be applied "mechanically" when construing whether a treaty or international agreement preempts a state law because "the nation-state, not subdivisions within one nation, is the focus of the [treaty] and the perspective of our treaty partners." See *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 175, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In order to determine whether a treaty trumps state law, therefore, the court should assess the language of the treaty and "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Id.* at 167, 119 S.Ct. 662 (quoting *Air France v. Saks,* 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)). The court must "be governed by the text—solemnly adopted by the governments of many separate nations—whatever conclusions might be drawn from the intricate drafting history that [exists]." *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

With these principles in mind, the court looks first to Article 14(b) for an expression of the treaty's intent. As previously noted, this provision bars the claims of signatory nations and their nationals arising out of Japan's actions in the Second World War. See *In re World War II,* 114 FSupp2d at 944–45. To be sure, the sig-

natory nations desired complete termination of all claims against Japan, but Article 14(b) has no effect on the claims of nationals from non-signatory nations. Hence, although from a perspective of 2001 it may seem anomalous for the United States to negotiate a treaty that bars the claims of its own nationals without a provision that forecloses resort to a judicial forum in the United States by nationals of non-signatory nations, Article 14(b) contains no express limitation against claims of non-signatory nationals. Little should be read into this omission, which most likely can be explained by the inconceivability a half century ago of such claims by non-signatory nationals being pursued in United States courts.

Other relevant provisions of the treaty suggest that the treaty does not address claims of non-signatory nationals. Specifically, article 4(a), which addressed Japan's post-war relationship with Korea, provides:

> The disposition of property of Japan and of its nationals *** and their claims, including debts, against [Korea], and the disposition in Japan of property of [Korean] authorities and residents, and of claims, including debts, of [Korean] authorities and residents against Japan and its nationals, shall be the subject of special arrangements between Japan and such authorities.

Treaty at 3173. Similarly, with respect to China, article 26 provides:

> Japan will be prepared to conclude with any State *** which is not a signatory of the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty ***.

*Id.* at 3190. These provisions suggest that the treaty contemplates resolution of war claims with Korea and China through agreements separate and distinct from the Treaty of Peace with Japan and separate

agreements necessarily create the possibility that the terms for resolving those claims may differ from the terms of the treaty entered into by the Allied nations. The fact that the signatory nations encouraged such agreements does not show an intent to occupy the field of non-signatory nations' claims through the treaty. See, eg, *Trojan Technologies, Inc. v. Com. of Penn.*, 916 F.2d 903, 906–07 (3d Cir.1990) (refusing to find that an international free trade agreement preempted a state buy-American statute, in part, because the language in the agreement was "hortatory rather than mandatory"). Whether the agreements subsequently entered by Japan with Korea and China eliminated the claims of these non-signatory nations does not bear on whether the Treaty of Peace with Japan preempts claims of Chinese and Korean nationals. The court reads the language of articles 4(a) and 26 to suggest only that the signatory nations, including the federal government of the United States, did not intend the Treaty of Peace with Japan to control claims of individuals from non-signatory nations.

To the extent section 354.6 provides a cause of action to such individuals, therefore, it does not conflict with the expressed intent of the treaty. Accordingly, the treaty itself does not trump the California law in this respect.

**B**

Simply because the claims of the Korean and Chinese plaintiffs derived from section 354.6 are not preempted by the Treaty of Peace with Japan does not mean that they can go forward, however. Providing a cause of action for these individuals triggers significant constitutional questions. Section 354.6 is unconstitutional because it infringes on the exclusive foreign affairs power of the United States.

■ Relative to many of the federal government's powers, the contours of the foreign affairs power has been infrequently analyzed and even less frequently clarified. Nevertheless, the national government's exclusive authority to regulate the foreign affairs of the United States has long been recognized as a constitutional principle of broad scope. See *United States v. Pink*, 315 U.S. 203, 233, 62 S.Ct. 552, 86 L.Ed. 796 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."); *Hines v. Davidowitz*, 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Belmont*, 301 U.S. at 331, 57 S.Ct. 758; *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936). "It follows that all state action, whether or not consistent with current foreign policy, that distorts the allocation of responsibility to the national government for the conduct of American diplomacy is void as an unconstitutional infringement on an exclusively federal sphere of responsibility." Tribe, § 4–5 at 656.

This principle, which prohibits state action that unduly interferes with the federal government's authority over foreign affairs derives from both the text and structure of the Constitution. The Constitution allocates power for external affairs to the legislative and executive branches of the national government and simultaneously prohibits the states from engaging in activities that might interfere with the national government's exercise of these powers. To be sure, there is no clause in the Constitution that explicitly grants a "foreign affairs power" to the federal government. See L Henkin, *Foreign Affairs and the United States Constitution* 14–15 (2d ed 1996) (hereinafter, Henkin). But a number of provisions, when read together, strongly imply that such authority was intended. See Harold G Maier, *Preemption of State Law: A Recommended Analysis*, 83 AmJ Int'l L 832, 832 (1989) (here-

inafter, Maier) ("[N]either the Articles of Confederation nor the Constitution provided for a general foreign affairs power. Nonetheless, there was never any real question that the United States would act as a single nation in the world community.").

Specifically, the Constitution provides that Congress possesses the authority "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const art I, § 8, cl 1, "[t]o regulate Commerce with foreign Nations," *id.*, cl 3, and "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," *id.*, cl 10. In addition, while Congress is granted the power "[to] declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," *id.*, cl 11, the President is designated the "Commander in Chief of the Army and Navy of the United States," *id.*, art II, § 2, cl 1. The President also is given the authority to "make Treaties" and "appoint Ambassadors" with the "Advice and Consent of the Senate," *id.*, cl 2, and to "receive Ambassadors and other public Ministers," *id.*, § 3.

With respect to the states, the Constitution directs that "[n]o State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal" or, without the consent of Congress, "lay any Imposts or Duties on Imports or Exports" or "enter into any Agreement or Compact *** with a foreign Power," or "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." *Id.*, § 1, cl 10.

These and other constitutional provisions evidence an intent on the part of the framers to grant paramount authority for foreign affairs to the political branches of the federal government, thereby necessitating the exclusion of intrusive efforts on the part of the states in foreign relations. The Federalist Papers bolster this interpretation. See *Hines,* 312 U.S. at 64 n. 9, 61 S.Ct. 399 ("The importance of the national power in all matters relating to foreign affairs and the inherent danger of state action in this field are clearly developed in [the] Federalist papers ***."). For example, James Madison wrote: "This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations." The Federalist No 42, at 264 (C Rossiter ed 1961). Similarly, Alexander Hamilton argued, albeit with respect to the related but explicit foreign commerce power of the national government, that

[t]he interfering and unneighborly regulations of some States, contrary to the true spirit of the Union, have, in different instances, given just cause of umbrage and complaint to others, and it is to be feared that examples of this nature, if not restrained by a national control, would be multiplied and extended till they became not less serious sources of animosity and discord than injurious impediments to the intercourse between the different parts of the Confederacy.

The Federalist No 22, at 144–45 (C Rossiter ed 1961). And as noted in *Hines,* "Thomas Jefferson, who was not generally favorable to broad federal powers, expressed a similar view in 1787: 'My own general idea was, that the States should severally preserve their sovereignty in whatever concerns themselves alone, and that whatever may concern another State, or any foreign nation, should be made a part of the federal sovereignty.'" *Hines,* 312 U.S. at 64 n. 11, 61 S.Ct. 399 (quoting *Memoir, Correspondence and Miscellanies from the Papers of Thomas Jefferson* (1829), vol 2, p 230, letter to Mr Wythe).

The Supreme Court has long acknowledged the federal government's broad authority over foreign affairs. In 1937, for example, Justice Sutherland noted that "complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." *Belmont,* 301 U.S. at 331, 57 S.Ct. 758. Similarly, Justice Black observed a few years later that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines,* 312 U.S. at 63, 61 S.Ct. 399. To be certain, the holdings of these and other decisions from the same time period were predominantly based on the supremacy of federal law; the Court determined that the state legislation at issue in these cases was preempted by existing federal law or international agreements. But the early observations contained in these cases regarding the national government's broad authority over foreign affairs are instructive because they describe the principles upon which the Supreme Court later relied in *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), to announce the foreign affairs doctrine that governs the case at bar.

In *Zschernig,* the Supreme Court observed that the Constitution entrusts "the field of foreign affairs *** to the President and the Congress." Id at 432, 88 S.Ct. 664 (citing *Hines,* 312 U.S. at 63, 61 S.Ct. 399). The Court concluded that, as a result, the Constitution itself excludes state intrusion on the federal government's authority over foreign affairs even when the federal branches have not acted. *Id.* at 432, 441, 61 S.Ct. 399; see also Henkin at 164. Pointing to the broad principle articulated in *Hines,* the Court stated that "even in the absence of a treaty [or other federal

law], a State's policy may disturb foreign relations. *** If there are to be such restraints, they must be provided by the Federal Government." *Zschernig,* 389 U.S. at 441, 88 S.Ct. 664. In short, the Court concluded that state statutes "must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440, 88 S.Ct. 664.

*Zschernig* involved an Oregon probate statute that conditioned the inheritance rights of an alien not residing in the United States on his ability to prove that American heirs would have a reciprocal right to inherit estates in the foreign country and that he would receive payments from the Oregon estate "without confiscation, in whole or in part, by the governments of such foreign countries." *Id.* at 430, 88 S.Ct. 664. The Supreme Court noted that it had earlier refused to invalidate a similar statute enacted by California "on its face" because that statute "would have only 'some incidental or indirect effect in foreign countries.'" *Id.* at 432–33, 88 S.Ct. 664 (quoting *Clark v. Allen,* 331 U.S. 503, 517, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947)). In *Zschernig,* however, the Court assessed "the manner of [the Oregon statute's] application" and observed that the law had compelled state courts to "launch[ ] inquiries into the type of governments that obtain in particular foreign nations." *Id.* at 434, 88 S.Ct. 664. The Court noted, for example, that the statute triggered assessments of "the actual administration of foreign law" and "the credibility of foreign diplomatic statements." *Id.* at 435, 88 S.Ct. 664. In short, the statute "seem[ed] to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own." *Id.* at 440, 88 S.Ct. 664. Looking at these effects of the Oregon statute, the Court concluded that it was unconstitutional because it "affect[ed] international relations in a persistent and subtle way," had a

"great potential for disruption or embarrassment" and triggered "more than 'some incidental or indirect effect in foreign countries.'" *Id.* at 434–35, 440, 88 S.Ct. 664.

*Zschernig* thus stands for the proposition that states may legislate with respect to traditional state concerns, such as inheritance and property rights, even if the legislation has international implications, but such conduct is unconstitutional when it has more than an "incidental or indirect effect in foreign countries." *Id.* at 440, 88 S.Ct. 664. As the First Circuit recently stated, under *Zschernig* "there is a threshold level of involvement in and impact on foreign affairs which the states may not exceed." *National Foreign Trade Council v. Natsios,* 181 F.3d 38, 49–57 (1st Cir. 1999), aff'd. on other grounds sub nom, *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Or, as the Third Circuit has summarized the doctrine, if a state law were to "involve[ ] the state in the actual conduct of foreign affairs[, the statute] is unconstitutional." *Trojan,* 916 F.2d at 913 (citing *Pink,* 315 U.S. 203, 62 S.Ct. 552).

This doctrine makes sense because the nation as a whole is affected when state-driven foreign policy has an impact on other countries. See Lori A Martin, *The Legality of Nuclear Free Zones,* 55 UChiLRev 965, 993 (1988). Indeed, for that very reason states have inadequate incentive to consider the effects of their actions on foreign relations. See *id.* *Zschernig* thus enables the courts to ensure that the states have not overstepped the line at the risk of endangering the nation as a whole.

Before evaluating section 354.6 in this regard, the court rejects the Korean and Chinese plaintiffs' suggestion that *Zschernig* is no longer valid. To be sure, some commentators have suggested that the reach of the Court's holding in *Zschernig* should be limited. See, eg, Henkin at 165 n* *; Curtis A Bradley & Jack L Goldsmith, *Customary International Law: A Critique of the Modern Position,* 110 HarvLRev 815, 865 (1997); Jack L Goldsmith, *Federal Courts, Foreign Affairs, and Federalism,* 83 VaLRev 1617, 1698–1706 (1997); Peter J Spiro, *The States and Immigration in an Era of Demi-Sovereignties,* 35 VaJInt'l L 121, 161–74 (1994); but see Tribe § 4–5 at 656–57; Maier at 832–33. But *Zschernig* has not been overruled, and thus the constitutional principles it enunciates remain the law. See *Natsios,* 181 F.3d at 59 ("[T]here is simply no indication, in *** any *** post-*Zschernig* case, that *Zschernig* is not good law and is not binding on us."). California and all states enacting legislation touching upon foreign affairs are thus bound by the doctrines of *Zschernig* until the Supreme Court instructs otherwise. As the Ninth Circuit has noted on numerous occasions, "speculation" about the continuing vitality of Supreme Court precedent "does not permit us to ignore [such] controlling *** authority." *United States v. Pacheco-Zepeda,* 234 F.3d 411, 414 (9th Cir.2000) (citing *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (directing that lower courts should leave to the Supreme Court "the prerogative of overruling its own decisions") (citation omitted)); see also *Montana Chamber of Commerce v. Argenbright,* 226 F.3d 1049, 1057 (9th Cir.2000) (citing *Agostini* and noting same); *Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182, 1192 (9th Cir.1998) (same).

Indeed, on two recent occasions the Ninth Circuit has recognized the continuing vitality of *Zschernig.* See *Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 751–53 (9th Cir.2001); *Int'l Assoc. of Indep. Tanker Owners v. Locke,* 148 F.3d 1053, 1068 (9th Cir.1998),

rev'd on other grounds sub nom *United States v. Locke,* 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). In *Tanker Owners,* the Ninth Circuit rejected an argument that oil regulations promulgated by the state of Washington were unconstitutional under *Zschernig* because the litigant "failed to demonstrate that, even if those regulations [had] some extraterritorial impact, that impact [was] more than 'incidental or indirect.'" *Tanker Owners,* 148 F.3d at 1069 (quoting *Zschernig,* 389 U.S. at 434, 88 S.Ct. 664). The decision affirms, therefore, that when a litigant makes a showing that the statute at issue triggers "more than 'some incidental or indirect effect in foreign countries,'" the statute is unconstitutional as an intrusion on the federal government's foreign affairs power. See *id.* (quoting *Zschernig,* 389 U.S. at 434, 88 S.Ct. 664).

Similarly, in *Gerling,* although the Ninth Circuit declined to apply *Zschernig* to California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA), CalInsCode §§ 13800–13807, see *Gerling,* 240 F.3d at 753, the court did not suggest that *Zschernig* is no longer valid. Rather, the court concluded that the HVIRA did not trigger the concerns implicated by the statutes in *Zschernig* and cases applying its doctrine. See *id.* The court stated that it "hesitate[d] to apply *Zschernig* to a facial challenge to state statutes involving 'foreign affairs' (a) but that mainly involve[d] foreign commerce and (b) that [were] not directed at a particular country." *Id.* The court also suggested that it was hesitant to apply *Zschernig* because "there is no evidence that HVIRA would implicate the diplomatic concerns mentioned in *Zschernig.*" *Id.* By implication, therefore, the Ninth Circuit would apply *Zschernig* to state statutes that do not regulate commerce, are directed at a particular country or implicate the diplomatic concerns present in *Zschernig.*

In addition, other courts have applied the principles of *Zschernig* to strike down state or local laws. See, e.g., *Natsios,* 181 F.3d 38, 49–61 (finding that the Massachusetts Burma Law, which restricted the ability of Massachusetts and its agencies from purchasing goods or services from companies that did business with Burma (Myanmar), was unconstitutional, in part, as a "threat to [the] federal foreign affairs power"); *Tayyari v. New Mexico State University,* 495 F.Supp. 1365, 1376–79 (D.N.M.1980) (striking down a University's policy designed to "rid the campus of Iranian students" because it conflicted with a federal regulation and "frustrate[d] the exercise of the federal government's authority to conduct the foreign relations of the United States"); *Springfield Rare Coin Galleries v. Johnson,* 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300, 305–07 (1986) (invalidating an Illinois statute that excluded South Africa from a tax exemption as more than an "incidental" intrusion on the federal government's foreign affairs power); *New York Times Co. v. City of New York Commission on Human Rights,* 41 N.Y.2d 345, 393 N.Y.S.2d 312, 361 N.E.2d 963, 969 (1977) (striking down a New York City antidiscrimination statute because it "interfere[d] with the foreign policy authority of the Federal Government"); *Bethlehem Steel Corp. v. Board of Commissioners,* 276 Cal.App.2d 221, 227–29, 80 Cal.Rptr. 800 (1969) (invalidating a California Buy American statute because it had "more than 'some incidental effect in foreign countries' and *** great potential for disruption ***.").

The infrequency with which *Zschernig* has been applied over the years does not suggest a weakening in the doctrine. To the contrary, it shows that the federal government has affirmatively enacted legislation or international agreements in most areas of foreign relations that expressly preempt conflicting state and local

legislation under the Constitution's Supremacy clause, thereby obviating the need for analysis under *Zschernig*. See, e.g., *Crosby*, 530 U.S. 363, 120 S.Ct. 2288 (affirming invalidity of the Massachusetts Burma law on preemption grounds). It also suggests that, despite several high profile examples of international involvement, state and local authorities tend to focus on state and local issues. See Howard N Fenton III, *The Fallacy of Federalism in Foreign Affairs: State and Local Foreign Policy Trade Restrictions*, 13 NwJInt'lL & Bus 563, 564 (1993). Indeed, most actions by states and municipalities that directly address foreign policy issues do not raise the type of diplomatic concerns expressed by the Court in *Zschernig*. For example, local authorities seeking to make international statements often enact non-binding resolutions or form sister-city relationships with foreign communities. See *id.* Section 354.6 represents a much greater foray into the field of foreign affairs.

■■ Turning to an analysis of section 354.6, the court reiterates that under *Zschernig*, California may legislate with respect to local concerns that touch upon foreign affairs, but only if its actions have just "some incidental or indirect effect in foreign countries." *Zschernig*, 389 U.S. at 433, 88 S.Ct. 664 (quoting *Clark*, 331 U.S. at 517, 67 S.Ct. 1431). The court concludes that section 354.6, as applied to defendants here, clearly crosses this "forbidden line." See *Clark*, 331 U.S. at 517, 67 S.Ct. 1431.

The court's conclusion is mandated by the following observations: (1) the terms of section 354.6 and its legislative history demonstrate a purpose to influence foreign affairs directly, (2) the statute targets particular countries, (3) the statute does not regulate an area that Congress has expressly delegated to states to regulate, (4) the statute establishes a judicial forum for negative commentary about the Japanese government and Japanese companies, (5) the Japanese government asserts that litigation of these claims could complicate and impede diplomatic relationships of the countries involved, and (6) the United States, through the State Department, contends that section 354.6 impermissibly intrudes upon the foreign affairs power of the federal government.

First, the language of section 354.6 and the contemporaneous comments of its creators demonstrate that the statute embraces a foreign policy purpose, namely, to provide a mechanism for individuals to obtain war-related reparations. By its terms, the statute purports to enable individuals from any country forced to labor during World War II by the Japanese government or Japanese companies "to recover compensation" for such labor. See CalCCP § 354.6(b). Moreover, as the notes to the statute indicate, the legislature determined that the "victims of Nazi [and Japanese] persecution have been deprived of their entitlement to compensation [earned] during the Second World War." *Id.*, note § 1(b). Indeed, Governor Gray Davis stated shortly after signing the bill that the law would "help right a historic wrong which occurred over 50 years ago during World War II when men, women and children were forced into slave labor." See Henry Weinstein, *Bill Signed Bolstering Holocaust–Era Claims*, LA Times, July 29, 1999, at A3. The author of the measure, Senator Tom Hayden, similarly asserted at the time:

> [Section 354.6] sends a very powerful message from California to the U.S. government and the German government, who are in the midst of rather closed negotiations about a settlement. \*\*\* If the international negotiators want to avoid very expensive litigation by survivors as well as very bad public relations for companies like Volkswagen and

Ford, they ought to settle. \*\*\* Otherwise, this law allows us to go ahead and take them to court.

*Id.* Since the statute purports to create a cause of action for compensation from companies related to "the Nazi regime, its allies or sympathizers," it cannot be doubted that the same message is intended for the Japanese government and Japanese corporations.

These issues and determinations which underlie section 354.6 are thus identical to the "uniquely federal" reparations concerns that were addressed by the United States while negotiating the Treaty of Peace with Japan. See *In re World War II*, 114 FSupp2d at 946; see also *Ware v. Hylton*, 3 U.S. (3 Dall) 199, 230, 1 L.Ed. 568 (establishing that the war-related claims of individual citizens can only be brought by their government); *Burger–Fischer v. DeGussa AG*, 65 F.Supp.2d 248, 273–74 (D.N.J.1999) (noting same). By establishing California courts as an avenue for reparations, therefore, section 354.6 engages California in the uniquely federal foreign policy function of addressing claims for reparations that arise in the aftermath of a war.

Second, section 354.6 targets particular countries by allowing a cause of action against companies that transacted business in any of the areas occupied by "the Nazi regime, its allies or sympathizers." See CalCCP § 354.6. Because the statute singles out such a narrow set of countries— most notably, Germany and Japan—it suggests that California intended the statute to send an explicit foreign relations message, rather than simply to address some local concern.

As a contrast, in *Trojan* the Third Circuit upheld a Pennsylvania "Buy American" law, in part, because "the statute applie[d] to steel from *any* foreign source, without respect to whether the country might be considered friend or foe." *Tro-*

*jan,* 916 F.2d at 913 (emphasis added). By not singling out a particular country or set of countries, the Pennsylvania statute implicitly focused on a local concern (the local steel industry), as opposed to engaging in international relations directly with a particular country or set of countries.

The Korean and Chinese plaintiffs point out that the Ninth Circuit referred to this characteristic of the law in *Trojan* when assessing the applicability of *Zschernig* to the HVIRA, implying that this court should do the same with respect to section 354.6. *Gerling,* 240 F.3d at 752–53. As discussed, the *Gerling* court was hesitant to apply *Zschernig,* in part, because the HVIRA was not directed at a particular country. *Id.* at 753. But, in this regard, section 354.6 is significantly different from the HVIRA. While section 354.6 is aimed at a few specific countries, the HVIRA applied to insurers from any country. See CalInsCode § 13804(a) ("*Any* insurer \*\*\* that sold \*\*\* insurance policies \*\*\* to persons in Europe, which were in effect between 1920 and 1945 [must file certain information with the insurance commissioner].") (emphasis added). Thus, the *Gerling* court's reliance on this observation in *Trojan* to minimize the foreign affairs effect of the HVIRA suggests the opposite conclusion for section 354.6.

With respect to this point, therefore, section 354.6 is closer to the statute struck down by the Supreme Court in *Zschernig.* The Oregon statute at issue was generally applied only against residents of a narrow set of countries (those "established on a more authoritarian basis than our own"); section 354.6 similarly applies only against companies of a narrow set of countries. Indeed, section 354.6 targets an even smaller set of countries than the law at issue in *Zschernig.* The California law's focus on a few particular countries, there-

fore, further evidences an intrusion by the state on the field of foreign affairs.

Third, section 354.6 does not regulate an area that Congress has expressly delegated to the states. In fact, by establishing a mechanism for forced labor victims to obtain war reparations, the statute relates to a subject that has always been addressed at the federal level. To the contrary, the HVIRA regulates insurance companies, which, as the *Gerling* court noted, has been deemed by the Supreme Court to be "a local matter." *Gerling,* 240 F.3d at 744 (citing *FTC v. Travelers Health Ass'n,* 362 U.S. 293, 302, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960)). At bottom, therefore, the "HVIRA is a California insurance regulation of California insurance companies ***." *Id.* at 746. The Ninth Circuit's hesitancy to apply *Zschernig* to a constitutional challenge of the HVIRA because the law regulated an area of commerce for which Congress had expressly delegated the regulatory power to the states is thus irrelevant to the court's analysis here. Accordingly, section 354.6 cannot be validated as a regulation of a local concern in the same manner as the HVIRA. The Korean and Chinese plaintiffs do not contend otherwise.

Fourth, because section 354.6 opens the door to lawsuits about the conduct of the Japanese government and Japanese companies during the Second World War, the primary dangers of the Oregon statute that concerned the Court in *Zschernig* are likewise triggered here. Specifically, such litigation cannot be carried to fruition without making "unavoidable judicial criticism" of the efforts of Japan and its war industry. See *Zschernig,* 389 U.S. at 440, 88 S.Ct. 664. To be sure, the commentary would by necessity focus on the past, but, particularly given the fact that it would emanate from the official forum of American courts, Japan's current regime could not avoid being negatively implicated by

association. It seems beyond doubt, therefore, that the statute has the potential to have an impact on foreign relations between the United States and Japan "in a persistent and subtle way." See *id.*

Fifth, and related to the court's fourth observation, the Japanese government has made clear that it is concerned about the effects of section 354.6 on Japan's relationship with the United States. See Views of the Government of Japan, United States SOI (Doc # 302), Exh 1. In a submission to this court by the Embassy of Japan, the Japanese government points out that the claims of the Korean and Chinese plaintiffs have already been settled or are in the process of being settled through diplomatic negotiations between Japan, China, and North and South Korea. See *id.* at 5. California's efforts to provide an alternative forum for these claims interferes with Japan's diplomatic efforts and credibility in this regard. As Japan states:

> Permitting plaintiff's claims will put the courts in the United States in an unwarranted place to inevitably affect relations between the countries concerned, including the bilateral settlement reached after highly political and sensitive negotiations. Such involvement of the courts in the United States could complicate and impede relationships between Japan and those countries as well as the bilateral relationship between the United States and Japan. The Government of Japan is convinced that these issues should not be adjudicated in the courts in the United States.

*Id.* To be sure, the court recognizes that Japan has a financial interest in repressing any demands for further compensation against its nationals arising out of the war. But Japan's submission nevertheless serves as a reminder that the United States also has its own interest in maintaining normal diplomatic relations with

Japan. The protests of the Japanese government thus demonstrate that section 354.6 has "great potential for [causing] disruption or embarrassment" here in the United States. See *Zschernig*, 389 U.S. at 435, 88 S.Ct. 664.

Finally, the federal government, as represented by the State Department, agrees with defendants that section 354.6 impermissibly intrudes on the foreign affairs power of the federal government. See United States SOI (Doc # 302) at 12–16. The State Department represents one of the two political branches with the exclusive authority to handle the country's foreign affairs, and thus it is in a good position (and certainly better position than this court) to determine if that power has been intruded upon. In this regard, the government asserts:

> By enacting the statute, California has created its own policy in a particular area of foreign relations—one which judges the activities of foreign governments and corporations during *** World War II, and the treaties and agreements Japan and other nationals made in the wake of the war. If each state were free to impose burdens that diverge from the foreign policy interests of the nation as a whole as expressed by the President and to have its own foreign policy, it would *** significantly diminish the President's "economic and diplomatic leverage" and, hence, his authority to negotiate agreements with foreign governments.

*Id.* at 16 (citation omitted). The court finds it notable that the Supreme Court concluded that application of the law at issue in *Zschernig* was unconstitutional even though the federal government had submitted an amicus curiae brief in which it stated that "[t]he government does not *** contend that the application of the *** statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations." *Zschernig*,

389 U.S. at 434–35, 88 S.Ct. 664. Section 354.6, to the contrary, has triggered the opposite reaction from the federal government. Accordingly, the concerns of the State Department further persuade the court to conclude that an application of section 354.6 to defendants here cannot pass constitutional muster.

The few arguments of the Korean and Chinese plaintiffs in opposition to this conclusion are unpersuasive.

First, the Korean and Chinese plaintiffs make much of the distinction between facial and as applied challenges to the constitutionality of a statute. Specifically, they argue that *Zschernig*, which the Court framed as an as-applied analysis, cannot govern the present inquiry because defendants have challenged the validity of section 354.6 on its face. See PlSuppBr (Doc # 323) at 6–7. But the Korean and Chinese plaintiffs are simply incorrect; defendants, in fact, challenge section 354.6 as it applies to them. See DefSuppBr (Doc # 336) at 1. As the Court established long ago, the proper method for adjudicating the constitutionality of a statute is for the affected parties to challenge the statute at issue as applied to them. See *United States v. Raines*, 362 U.S. 17, 20–21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). In *Raines*, the Court made clear that "[t]he very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly before them." *Id.*; see also *United States v. Kurt*, 988 F.2d 73, 76 (9th Cir.1993) ("A defendant cannot claim a statute is unconstitutional in some of its reaches if the statute is constitutional as applied to him.") (citing *Raines*, 362 U.S. at 21–22, 80 S.Ct. 519); Richard H Fallon, Jr, *As–Applied and Facial Challenges and Third–Party Standing*, 113 HarvLRev 1321, 1324 (2000) (concluding that "there is

no single distinctive category of facial, as opposed to as-applied, litigation. Rather, all challenges to statutes arise when a particular litigant claims that a particular statute cannot be applied against her.").

To be sure, both the Supreme Court and the Ninth Circuit have cited this distinction as a factor influencing their analyses under the foreign affairs doctrine. See *Zschernig*, 389 U.S. at 433, 88 S.Ct. 664 (distinguishing *Clark*, in which the Court had refused to strike down a similar California statute, as addressing a challenge to the statute on its face); *Gerling*, 240 F.3d at 752 (noting that the HVIRA was challenged on its face). But given the posture of the challenge to section 354.6 brought by defendants, the court is not persuaded by the efforts of the Korean and Chinese plaintiffs to cloud the analysis here.

The Korean and Chinese plaintiffs also contend that because defendants are businesses, as opposed to foreign governments, section 354.6 does not implicate *Zschernig's* foreign affairs doctrine. See PlSuppBr (Doc # 323) at 8. But such a contention does square with their complaints, in which the Korean and Chinese plaintiffs emphasize that the conduct of the Japanese companies during the war was condoned and controlled by the Japanese government. See, e.g., *Sung* Compl, ¶ 10 ("The Japanese government set up programs whereby Japanese companies (including defendants) could use civilian internees as slaves or forced laborers."); *Oh* Compl, ¶¶ 65, 67 ("In August 1936, Japanese Army General Minami Jiro was appointed Governor–General of Korea. Under his control private Japanese companies, including the Defendants, expanded those industries in Korea critical to Japan's war-making ability. *** Japan enacted laws applicable to Korea forcing Koreans to labor in certain industries."). The Japanese government, as opposed to just these private defendants, is clearly implicated by the claims asserted under section 354.6 by the Korean and Chinese plaintiffs.

Even if these cases could somehow be characterized as claims between private parties, *Zschernig* clearly instructs that an application of state legislation that has more than "some incidental or indirect effect *in foreign countries* " is invalid. See *Zschernig*, 389 U.S. at 434, 88 S.Ct. 664 (emphasis added). Whether section 354.6 is applied to businesses or the Japanese government, the statute certainly has an effect in Japan.

Finally, the Korean and Chinese plaintiffs also suggest that since Congress has not addressed the subject matter here—forced labor compensation claims against Japanese companies—then there is no federal policy or legislation with which section 354.6 may conflict. See PlSuppBr (Doc # 323) at 8. To be sure, this argument would be relevant if the court were analyzing whether section 354.6 violated the federal government's foreign commerce authority. See *Gerling*, 240 F.3d at 743–51. As already discussed, however, the foreign affairs doctrine prohibits state and local intrusion into the field of foreign relations regardless whether a conflicting federal law or policy exists. See Tribe, § 4–5 at 656 ("[A]ll state action, whether or not consistent with current federal foreign policy, that distorts the allocation of responsibility to the national government for the conduct of American diplomacy is void ***."). It is the intrusion itself, which *could* inhibit the federal government's ability to "deal with those problems," that makes the application of such legislation unconstitutional. See *Zschernig*, 389 U.S. at 441, 88 S.Ct. 664. The federal government's actual policy, therefore, is irrelevant to the court's analysis.

Based on the foregoing observations, the court concludes that applying section 354.6

to defendants will "affect[ ] international relations in a persistent and subtle way," have a "great potential for disruption or embarrassment" in the United States and trigger "more than some incidental or indirect effect" in Japan. See *Zschernig* at 434–35, 440, 88 S.Ct. 664. As a result, California's attempt to provide a cause of action to the Korean and Chinese plaintiffs against defendants is an unconstitutional intrusion on the exclusive foreign affairs power of the federal government.

### III

In light of the court's conclusion that the application of section 354.6 to defendants is unconstitutional, the Korean and Chinese plaintiffs may not rely on the California statute to pursue their claims against defendants. The Korean and Chinese plaintiffs contend, however, that they allege claims that arise under other statutes as well, namely the Alien Tort Claims Act (ATCA), 28 USC § 1350, and various California laws. The court addresses these claims now.

### A

■ The court turns first to the Korean and Chinese plaintiffs' purported claims under the ATCA. Although no reference is made to the ATCA in any of the seven complaints, the Korean and Chinese plaintiffs place extensive reliance on the statute and the few decisions interpreting it to oppose defendants' motions to dismiss.

The ATCA, originally enacted by the 1st Congress in the Judiciary Act of 1789, provides that

> [t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 USC § 1350. In the Ninth Circuit, section 1350 provides both federal jurisdiction and a substantive right of action for certain violations of customary international law. *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1474–76 (9th Cir.1994) (*Marcos II*); see also *Alvarez–Machain v. United States*, 107 F.3d 696, 703 (9th Cir.1996). In order to state a claim under the ATCA, a plaintiff must allege (1) a claim by an alien, (2) asserting a tort (3) committed in violation of the law of nations (i e, international law). See *Doe v. Unocal Corp.*, 110 FSupp2d 1294, 1303 (C.D.Cal.2000). To be actionable under section 1350, an alleged violation must be of an international norm that is "specific, universal and obligatory." See *Marcos II*, 25 F.3d at 1475 (citing *Filartiga v. Pena–Irala*, 630 F.2d 876, 881 (2d Cir.1980); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C.Cir. 1984)).

Defendants do not challenge that the elements for a claim under section 1350 have been satisfied here. With respect to the first two elements, most of the Korean and Chinese plaintiffs reside outside of the United States and the type of actions that defendants are alleged to have committed during the Second World War inflicted personal injuries that sound in tort. Regarding the third element, two of the seven complaints allege that the defendants forced the plaintiffs to labor without compensation in violation of their rights under international law. See *Kim* Compl, ¶¶ 76–79, 81; *Choe* Compl, ¶ 81.

■ Whether requiring individuals to engage in forced and slave labor meets the "specific, universal and obligatory standard" required to violate the law of nations has not been specifically addressed by the Ninth Circuit. Cf. *Marcos II*, 25 F.3d at 1475 (finding that official torture violates the law of nations). To be sure, the Ninth Circuit has noted in passing that slavery violates a *jus cogens* norm. *United States v. Matta–Ballesteros*, 71 F.3d 754, 764 n. 5

(9th Cir.1995) (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir.1992)). Such norms are "nonderogable and peremptory, enjoy the highest status within customary international law, are binding on all nations, and can not be preempted by treaty." *Id.* (citation omitted). It remains unclear, however, whether all *jus cogens* norms meet the "specific, universal and obligatory standard" required to be actionable under section 1350.

Courts faced with making this determination may be guided by judicial decisions enforcing the law of nations, the work of jurists and the general usage and practice of nations. *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1383 (9th Cir.1998) (citing *Siderman*, 965 F.2d at 714–15); see also *United States v. Smith*, 5 Wheat. 153, 18 U.S. 153, 160–61, 5 L.Ed. 57 (1820). In this regard, a district court in New Jersey addressing forced labor claims under the ATCA against Ford Motor Company recently concluded that "[t]he use of unpaid, forced labor during World War II violated clearly established norms of international law." *Iwanowa v. Ford Motor Co.*, 67 FSupp2d 424, 440 (D.N.J.1999). As that court reasoned, this conclusion is supported by the following: (1) the Nuremberg Tribunals held that enslavement and deportation of civilian populations during the war constituted a crime against humanity in violation of international law, *id.* (citing R Jackson, *The Nuremberg Case* xiv–xv (1971)); (2) the Nuremberg Principle IV(b) provides that the "deportation to slave labor *** of civilian populations of or in occupied territory" constitutes both a "war crime" and a "crime against humanity," *id.* (quoting Nuremberg Charter, annexed to the London Agreement on War Criminals, Aug 8, 1945, art 6, 59 Stat 1544, 82 UNTS 279); and (3) several American and German jurists have stated that conduct related to slave labor violates international law, *id.* at 440–41 (citing *Handel v.*

*Artukovic*, 601 F.Supp. 1421, 1426 n. 2 (C.D.Cal.1985); *Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir.1995); *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1180 (D.C.Cir.1994) (Wald, J, dissenting); *Siderman*, 965 F.2d at 715; *Tel–Oren*, 726 F.2d at 781 (Edwards, J, concurring); LG [District Court of Germany] Bremen, 1 O 2889/90 at 7 (1998) (FRG); *Krakauer v Federal Republic of Germany*, LG [District Court of Germany] Bonn, 1 O 134/92, at 21 (1997) (FRG), rev'd on other grounds, OLG [Court of Appeals] Cologne, 7 U 222/97 (1998) (FRG)).

Given the Ninth Circuit's comment in *Matta–Ballesteros*, 71 F.3d at 764 n. 5, that slavery constitutes a violation of *jus cogens*, this court is inclined to agree with the *Iwanowa* court's conclusion that forced labor violates the law of nations. Indeed, it seems beyond doubt that the forced labor practices of defendants during the Second World War violated traditional international law. But such conduct took place over 50 years ago. To the extent the Korean and Chinese plaintiffs have asserted claims under the ATCA for conduct taking place during World War II, the court concludes that the claims must be dismissed because they are time-barred.

■ Although the ATCA itself does not contain a statute of limitations, when a cause of action under federal civil law does not have a directly applicable limitations period, the Supreme Court has instructed that the court should not assume that no time limit for the cause of action was intended. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 158, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Instead, the court must "borrow" the most suitable limitations period from some other source, traditionally, the law of the forum state. *Id.*; see also 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4519 at 595

(West Publishing Co 1996). Since "[s]tate legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies," however, the Supreme Court has recognized a narrow exception to the general rule that statutes of limitation are to be borrowed from state law. *Reed v. United Transportation Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989) (quoting *Occidental Life Ins. Co. of California v. EEOC,* 432 U.S. 355, 367, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977)). Specifically, the court should not borrow the state limitations period "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (quoting *DelCostello,* 462 U.S. at 172, 103 S.Ct. 2281).

With these principles in mind, the court must identify the closest analogies to the ATCA from both state and federal law and determine which one presents the best analogy. *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1547 (N.D.Cal.1987); see also *Iwanowa,* 67 FSupp2d at 462–63 (citing *Forti*); *Xuncax v. Gramajo,* 886 F.Supp. 162, 190–93 (D.Mass.1995) (same). The Korean and Chinese plaintiffs have brought their claims under the ATCA in an effort to obtain compensation from defendants for the damages caused by requiring them to engage in forced and slave labor during the Second World War. This effort closely resembles a personal injury suit, such as for false imprisonment, and thus the most analogous state laws are those providing personal injury causes of action for intentional torts. In California, such tort actions have a one year statute of limitations. See Cal Civil Proc. Code § 340(3).

Locating the closest federal statute is a relatively straightforward task. In 1991, Congress enacted the Torture Victim Protection Act (TVPA) as a statutory note to the ATCA. See 28 USC § 1350, notes. The TVPA provides that any "individual who, under actual or apparent authority, or color of law, of any foreign nation *** subjects an individual to torture *** [or] extrajudicial killing shall, in a civil action, be liable for damages ***." *Id.,* note § 2(a). Given the similarity between forced labor and torture—both of which, as noted above, the Ninth Circuit considers to be violations of *jus cogens* norms—combined with Congress' decision to incorporate the TVPA into the notes of the ATCA, the court concludes that the TVPA serves as the closest federal statute to the ATCA. The TVPA provides a ten year limitations period. 28 USC § 1350, note § 2(c).

In light of the fact that the TVPA is directed at conduct committed in foreign nations that violates customary international law (torture and extrajudicial killing), much like a cause of action under the ATCA would address, the court concludes that the TVPA is a much better analogy than state law. Indeed, the courts that have evaluated what limitations period should apply under the ATCA since the TVPA was enacted have reached the same conclusion. See, e g, *Iwanowa,* 67 F.Supp.2d at 462; *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1195–96 (S.D.N.Y. 1996); *Xuncax,* 886 F.Supp. at 192–93. Accordingly, the court concludes that the TVPA's ten year statute of limitations applies to the claims of the Korean and Chinese plaintiffs.

Federal law determines when a cause of action accrues and the statute of limitations begins to run. *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999). Under federal law, a plaintiff's cause of action accrues "when the plaintiff knows or

has reason to know of the injury which is the basis of the action." *Id.* Under this standard, the Korean and Chinese plaintiffs were aware of their injuries no later than when the war ended in 1945. These cases were initiated, however, in 1999 and 2000, over 50 years later and well outside the ten year limitations period.

Intertwined in the analysis of the timeliness of an action, of course, is whether the applicable statute of limitations has been tolled. When borrowing the limitations period from another federal statute, federal, rather than state, tolling doctrines apply. See *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1199 (9th Cir.1988) (citing *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 466, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)); see also Wright, Miller & Cooper, 19 *Federal Practice and Procedure* § 4519 at 627–33 (West Publishing Co 1996). As the Ninth Circuit has pointed out, the Senate Report on the TVPA states that the ten-year limitations period is subject to equitable tolling. *Hilao v. Estate of Marcos,* 103 F.3d 767, 773 (9th Cir.1996) (*Marcos III* ) (citing S. Rep. No 249, 102d Cong, 1st Sess, at 11 (1991)). Such tolling may be triggered if the defendant has engaged in wrongful conduct, or extraordinary circumstances occurred outside of the plaintiff's control, which prevented the plaintiff from asserting his claim during the limitations period. *Id.* At bottom, however, "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984); see also *Lehman v. United States,* 154 F.3d 1010, 1016 (9th Cir.1998), cert. denied, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999) ("Equitable tolling \*\*\* is not available to avoid the consequences of one's own negligence.").

None of the allegations in the Korean and Chinese plaintiffs' complaints suggest that they could not have attempted to bring these claims sooner. To be sure, the Ninth Circuit only formally recognized a right of action under the ATCA in 1994. See *Marcos II,* 25 F.3d at 1475. But the statute has been in force since the 18th century and several courts found it to provide a cause of action much earlier than the Ninth Circuit. See, e g, *Abdul–Rahman Omar Adra v. Clift,* 195 F.Supp. 857, 865 (D.Md.1961) ("The wrongful acts were therefore committed in violation of the law of nations. And since they caused direct and special injury to the plaintiff, he may bring an action in tort therefor."); *Filartiga v. Pena–Irala,* 630 F.2d 876, 881 (2d Cir.1980); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1539 (N.D.Cal.1987).

The Korean and Chinese plaintiffs do not assert reasons why their claims could not have been brought under the ATCA within ten years of the war's end. Their reference to the Japanese government's alleged suppression of similar claims brought by Korean forced laborers in Japan shortly after the war does not explain why the same claims could not have been alleged in a United States court. See PlOppBr (Doc # 254) at 26 n 44. Moreover, to the extent the Korean and Chinese plaintiffs contend that they were not aware of the opportunity to bring these claims in the United States, "mere ignorance of the cause of action does not, in itself, toll the statute." *Volk, LA v. DA Davidson & Co.,* 816 F.2d 1406, 1416 (9th Cir.1987).

The court concludes, therefore, that the ten year limitations period on the Korean and Chinese plaintiffs' international law claims under the ATCA has not tolled. Accordingly, to the extent such claims could have been asserted against defen-

dants for their forced labor practices during the Second World War, they are barred by the statute of limitations.

### B

■ As previously noted, the Korean and Chinese plaintiffs also seek compensation and restitution under other California state laws. Specifically, among the seven complaints the Korean and Chinese plaintiffs allege the following state law claims: (1) false imprisonment; (2) assault and battery; (3) conversion; (4) unjust enrichment and quantum meruit; (5) constructive trust; (6) accounting; (7) the Unfair Competition Act (UCA), Cal Bus & ProfCode §§ 17200 et seq; and (8) violations of Article 1 of the California Constitution and Penal Code § 181, which prohibit involuntary servitude. To the extent the conduct of defendants during the Second World War would have been actionable under any of these California laws, they are also barred by the applicable statutes of limitations.

It has long been established that a federal court addressing state law claims generally "utilizes its own state's statute of limitations." *Forsyth v. Cessna Aircraft Co.,* 520 F.2d 608, 613 (9th Cir.1975); see also Restatement Second, Conflict of Laws § 142. Because the forced labor underlying these claims occurred in China and Japan, a conflict of law question arises for which the court must look to the laws of the forum state, including its choice of law rules, to determine which statutes of limitations to apply. See *Guaranty Trust Co. of N.Y. v. York,* 326 U.S. 99, 109–10, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Santana v. Holiday Inns, Inc.,* 686 F.2d 736, 737–38 (9th Cir.1982). California employs a "governmental interest" approach to choice of law questions, essentially requiring an analysis regarding the potential conflict between the statute of limitations in California and those applicable in China and Japan and, if a conflict exists, an assess-

ment of the competing interests of the forums. See *In re Yagman,* 796 F.2d 1165, 1170 (9th Cir.1986). Such analysis is not necessary here, however, because the statutes of limitations from all three forums are significantly shorter than the age of these claims.

Under California law, the longest applicable statute of limitations, which relates to the UCA, is just four years. See Cal Bus & ProfCode § 17208. All of the other state law claims asserted by the Korean and Chinese plaintiffs trigger a limitations period under California law between one to three years from the date the claims accrued. See CalCCP §§ 338, 339, 340. The Civil Code of Japan provides that claims lapse if not exercised within ten years. See The Civil Code of Japan, art 167 at FA 29 (Exhibits in Support of Motion to Dismiss (Doc # 212), Exh Z). Under the law of China, the longest applicable statute of limitations is two years for civil suits. See Civil Law of China, arts 135–37 (Exhibits in Support of Motion to Dismiss (Doc # 212), Exh AA).

The Korean and Chinese plaintiffs do not contend that these statutes of limitations have been tolled. In fact, they appear to concede the futility of these state law claims by arguing exclusively that their claims are valid under section 354.6 and the ATCA. In support of this assessment, the court notes that the people of the state of California, through the office of the Attorney General, states that "[a]bsent [section 354.6, the plaintiffs] would be without a remedy ***." Amicus Curiae Brief of the People of the State of California (Doc # 101) at 1. Further buttressing this conclusion is the fact that district courts in Japan addressing similar claims have uniformly dismissed such actions, in part, because the applicable statutes of limitations have run. See Appeal to International Labour Organization Regarding

Violation of Convention No 29 by Japan During Wartime (Pl Appendix (Doc # 14), Exh I) at 3.

To the extent the Korean and Chinese plaintiffs' complaints are based on these California statutes, therefore, the court concludes that they are time-barred.

### IV ·

For the foregoing reasons, the motions to dismiss and/or for judgment on the pleadings are GRANTED with respect to the actions involving the Korean and Chinese plaintiffs. The clerk shall enter judgment in the above-captioned cases, terminate all motions and close the files.

IT IS SO ORDERED.